629 F.2d 248
 23 Fair Empl.Prac.Cas. 86, 23 Empl. Prac.
Dec. P 31,062
Joanne GLUS, Kathleen Swanson, Louise Zyla, Constance Simm,
Mary A. Geissler, Lois Ann Podbesek, Joan E. Hornfeck,
Maxine Bray, Joanne L. Romesburg, Mary Kahler, Stella Walny,
Carlene M. Falco, Bernice M. Shrum, Sandra K. Evans, Rose
Marie Adamcik, Alicia A. Ukasik, Karen L. Rossason, Virginia
Anderson, Donna Craig
v.
The G. C. MURPHY COMPANY, Retail, Wholesale and Department
Store Union, Local #940 and International Union of
Wholesale and Department Store Union, AFL-CIO,
G. C. Murphy Company, Appellant in No. 79-1508,
International Union of Wholesale and Department Store Union,
AFL-CIO, Appellant in No. 79-1507.
 Nos. 79-1507, 79-1508.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 15, 1979.
Decided June 27, 1980.
Certiorari Denied Nov. 3, 1980.
See 101 S.Ct. 351.
 
 Robert H. Stevenson (argued), Anderson, Moreland & Bush, Pittsburgh, Pa., for The G. C. Murphy Co.
 Joseph Mark Maurizi (argued), Balzarani, Walsh & Maurizi, Pittsburgh, Pa., Robert Markewich, Markewich, Rosenhaus, Markewich & Freidman, New York City, for Intern. Union of Wholesale and Department Store Union, AFL-CIO.
 Before GIBBONS, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 The International Union of Wholesale and Department Store Union, AFL-CIO (the International) appeals for a second time from an order of the district court which holds it liable in contribution to The G. C. Murphy Company (Murphy) for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2000e-17 (Title VII). Murphy cross-appeals challenging the district court's calculations of the International's liability. We agree with the district court that Murphy has a right of contribution. We will affirm.
 
 I.
 
 2
 These appeals arise out of a class action brought in 1971 on behalf of all females employed by The G. C. Murphy Company from July 1965 to January 1971. The plaintiffs in that action named as defendants Murphy; the International; the Retail, Wholesale and Department Store Union, Local 940 (Local 940); and Teamster's Local 249 (Local 249), the successor collective-bargaining agent of Local 940. They alleged, inter alia, that Murphy and the unions had violated Title VII and the Equal Pay Act of 1963, 29 U.S.C. § 206, by agreeing to and maintaining a collective-bargaining agreement that provided for separate job classifications, pay scales, and seniority systems for male and female employees.
 
 
 3
 After the filing of answers, Murphy filed a cross-claim against the unions in which it asserted that the unions were solely liable for the discrimination complained of and that if Murphy was found liable, it had a right of contribution against the unions. Prior to trial a settlement was reached by Murphy and the plaintiff class. The settlement was approved by the district court. It provided for the payment of $548,000 in damages and $100,000 in attorneys' fees. The payment was to be made in three installments with six percent interest on the deferred payments; $100,000 of the $548,000 was allocated to the Equal Pay Act charge.
 
 
 4
 Murphy continued to press for contribution from the unions and eventually settled with Local 940 for $4,146, the total amount in Local 940's treasury. Trial proceeded on Murphy's claim against the International and Local 249. The district court concluded that Murphy and the defendant unions had violated Title VII and that they were equally liable for the discrimination and thus equally responsible for the financial loss of the plaintiffs. After dividing the damages, the court entered judgment against the International in the amount of $242,337. Glus v. G. C. Murphy Co., Civ. No. 71-264 (W.D.Pa. Apr. 29, 1976), reprinted in Joint Appendix at 124a-78a (hereinafter Glus I ).
 
 
 5
 The International appealed from that judgment asserting that the district court did not have jurisdiction over it under Title VII because the International had not been named in the complaint filed by the plaintiffs with the Equal Employment Opportunity Commission (EEOC). It also asserted that no right of contribution could be claimed for violations of Title VII or the Equal Pay Act. In the first appeal we held that Murphy had no right of contribution under the Equal Pay Act, Denicola v. G. C. Murphy Co., 562 F.2d 889 (3d Cir. 1977), but remanded for further proceedings on the issue of whether the district court had jurisdiction under Title VII. Glus v. G. C. Murphy Co., 562 F.2d 880 (3d Cir. 1977). On remand the district court found that the plaintiff had not named the International in the EEOC complaint but that the omission did not result in an absence of jurisdiction. Glus v. G. C. Murphy Co., Civ. No. 71-264 (W.D.Pa. Feb. 14, 1979), reprinted in Joint Appendix at 833a-40a (hereinafter Glus II ). The International appeals for a second time challenging the district court's conclusions on jurisdiction and challenging the district court's earlier decision on the right of contribution. Murphy cross-appeals arguing that the district court did not properly calculate the amount due under the right of contribution.
 
 II. Title VII Jurisdiction
 
 6
 In the first appeal we enumerated four factors that should be considered in determining whether the district court had jurisdiction under Title VII. They were:
 
 
 7
 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named (party) are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.
 
 
 8
 562 F.2d at 888. This four-prong test is not a mechanical one; no single factor is decisive. Instead each factor should be evaluated in light of the statutory purposes of Title VII and the interests of both parties. The district court applied these factors and concluded that it had jurisdiction. We agree.
 
 
 9
 The interests of Local 940, which was named in the EEOC complaint, and the International are identical in all significant aspects, and thus the International was not harmed by its absence from the EEOC proceedings. Their liability arises from their participation in the same collective-bargaining agreements. The International was the sole union signatory to the collective-bargaining agreement for a portion of the period where discrimination was found to have taken place; later both the International and Local 940 signed the agreements. The International's representative was the chief union negotiator at many of the negotiation sessions. The International's interests were vigorously litigated by Local 940 at the EEOC proceedings. Local 940 stood firm in its denial of liability. Further, both the International and Local 940 were represented by the same attorney, Emil E. Narick, Esq., in the district court proceeding until Murphy filed its claim for contribution.
 
 
 10
 The plaintiffs' interests were not harmed by the International's absence in the EEOC process. If a settlement had been reached during the EEOC proceeding, complete relief could have been obtained from the defendants then present. We also note the finding of the district court that the close relationship between the International and Local 940 could have led the plaintiff to reasonably assume that the interests of both unions were to be represented by Local 940. Glus II, App., at 838a-39a. Finally, we agree with the district court that the conciliation process was not rendered less effective because of the absence of the International. The settlement agreement was not reached until the federal court action had begun, at which time the International was a party to the litigation.
 
 
 11
 We will therefore affirm the district court's decision on the jurisdictional issue.[1]
 
 III. Right to Contribution
 
 12
 In its cross-claim Murphy requested contribution for what it asserted was the International's share of the damages Murphy had paid in the settlement agreement. By its express terms Title VII does not provide for a right of contribution. Murphy asserts that nevertheless a right of contribution exists in the federal common law arising from Title VII. It is to this claim that we now turn.
 
 A.
 
 13
 At the outset we note our disagreement with the International and the dissent that no right of contribution exists in the federal common law because there is an "established rule that contribution would not be implied in the absence of a statutory provision." At 267. Initially most American courts held that there was no right of contribution under the common law, relying on the English decision Merryweather v. Nixan, 8 Term R. 186, 101 Eng.Rep. 1337 (K.B.1799). See, e. g., Union Stock Yards Co. v. Chicago, Burlington, & Quincy Railroad Co., 196 U.S. 217, 25 S.Ct. 226, 49 L.Ed. 453 (1905). This prohibition resulted from the belief that a wrongdoer should not be able to shift the responsibility of his actions to the shoulders of another. The rule prohibiting contribution has come into disrepute. It is now widely recognized that fundamental fairness demands a sharing of the liability. Without a right of contribution a wrongdoer may escape liability for his actions because of the happenstance of the plaintiff's choice of defendants. See Prosser, The Law of Torts, § 50 (4th ed. 1971). See also Sellers, Contribution in Antitrust Damage Actions, 24 Vill.L.Rev. 829, 855-63 (1979) (reviewing state law on contribution). The vast majority of the states have now rejected the prohibition either by statute, e. g., Del.Code tit. 10, §§ 6301-08; Pa.Cons.Stat.Ann. tit. 42 §§ 8323-27 (Purdon 1979), or by judicial action. E. g., Knell v. Feltman, 174 F.2d 662 (D.C. Cir. 1949); State Farm Auto Insurance Co. v. Continental Casualty Co., 264 Wis. 493, 59 N.W.2d 425 (1953).
 
 
 14
 The International argues that the prohibition still exists in federal law, relying on Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952). Cf. Olson Farms, Inc. v. Safeway Stores, Inc., 1979 2 Trade Cases P 62,995 (10th Cir. 1979) (relying on Halcyon Lines to deny contribution under federal anti-trust laws). We do not agree. Halcyon Lines was an action for contribution arising under the admiralty jurisdiction of the federal courts. The Court found the claim inconsistent with the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-944. It denied the claim and stated, "(I)n the absence of legislation, courts exercising a common-law jurisdiction have generally held that they cannot on their own initiative create an enforceable right of contribution as between joint tortfeasors." 342 U.S. at 285, 72 S.Ct. at 279. For a number of years this language was relied upon to deny claims for contributions brought under federal law. See, e. g., Goldlawr, Inc. v. Shubert, 276 F.2d 614, 616 n. 3 (3d Cir. 1960) (anti-trust law). However, in 1974 the Supreme Court held that its holding was not as far-reaching as the language suggests. In Cooper Stevedoring Co., Inc. v. Fritz Kopke, Inc., 417 U.S. 106, 111-13, 94 S.Ct. 2174, 2177-78, 40 L.Ed.2d 694 (1974), the Court explained that it had denied contribution in Halcyon Lines only because under the facts of that case contribution was inconsistent with the Harbor Workers' Act. It stated:
 
 
 15
 (W)e think Halcyon stands for a more limited rule than the absolute bar against contribution . . . . On the facts of this case, then, no countervailing considerations detract from the well-established maritime rule allowing contribution between joint tortfeasors.
 
 
 16
 The Supreme Court has yet to review a contribution claim in a case outside of the admiralty context since Cooper Stevedoring. But a number of lower courts have read Cooper Stevedoring as supporting rights of contribution in federal common law claims. E. g.,, Professional Beauty Supply Inc. v. National Beauty Supply, Inc., 594 F.2d 1179 (8th Cir. 1979) (anti-trust law); Kohr v. Allegheny Airlines Inc., 504 F.2d 400 (7th Cir. 1974), cert. denied, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975) (aviation law). But see Olson Farms, Inc. v. Safeway Stores, Inc. (denying right of contribution in anti-trust law). Thus, Cooper Stevedoring provides positive support for our conclusion that a federal common law right of contribution exists.
 
 B.
 
 17
 As we noted above, no right of contribution is expressly provided for in Title VII. This does not, however, end our inquiry. For this does not necessarily reflect a congressional intention to deny a right of contribution. Rather it reflects the probability that contribution, although of considerable importance, was not contemplated by the drafters of the legislation. We must therefore inquire into the interstices of Title VII to respond to Murphy's claim.
 
 
 18
 The responsibility of federal courts to define the body of federal common law which arises from the interstices of federal legislation has been established by a number of Supreme Court decisions. E. g., Illinois v. Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (federal common law right of nuisance recognized and applied to the pollution of interstate waters); Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (federal labor law); Texas & Pacific Railway v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916) (Safety Appliance Act).
 
 
 19
 The scholarly debate about the power of the federal courts to recognize common law claims rages as does the debate on the source of that power and the extent to which it can be exercised. See, e. g., Ely, The Irrepressible Myth of Erie, 87 Harv.L.Rev. 693 (1974); Friendly, In Praise of Erie And the New Federal Common Law, 39 N.Y.U.L.Rev. 383 (1964); Bickel & Wellington, Legislative Purpose and the Judicial Process, 71 Harv.L.Rev. 1 (1957). Yet, in spite of the stridency of the debate, two principles firmly and resolutely emerge. First, there is a federal common law, Illinois v. Milwaukee, 406 U.S. at 98-102, 92 S.Ct. at 1390-1392. Second, in some circumstances federal common law causes of action arise from the interstices of congressional acts. See, e. g., Textile Workers v. Lincoln Mills. Common law actions arising from federal legislation have been recognized in a variety of circumstances, including instances when the common law establishes remedies and standards not set forth in the legislation, but necessary for the fulfillment of the legislative purpose, e. g., Illinois v. Milwaukee ; Textile Workers v. Lincoln Mills, and instances where the common law provides a cause of action for an individual who has been harmed by the violation of the federal statute. E. g., J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Texas & Pacific Railway v. Rigsby. In our review of the literature and the case law we discern two types of cases which establish the framework for our determination of whether a common law right of contribution arises from the interstices of Title VII.
 
 
 20
 The first are cases in which the common law provides remedies or standards when legislation related to the petitioner's claim does not address the specific situation presented. These cases are illustrated by the seminal decision, Textile Workers Union v. Lincoln Mills. In Lincoln Mills the plaintiff union charged Lincoln Mills with violating a collective-bargaining agreement. The Supreme Court held that the standards for evaluating the claim were to be found in the federal common law. The Court reasoned that when Congress granted to the federal courts jurisdiction over controversies involving labor organizations in the Labor Management Relations Act, 29 U.S.C. §§ 141-187, it wanted those controversies to be resolved by a federal common law. The Court argued that a uniform federal law was necessary to achieve the purposes of the Act. Although it made no extensive analysis of the source of its power to fashion this body of common law, it noted, "(i)t is not uncommon for federal courts to fashion federal law where federal rights are concerned." 353 U.S. at 457, 77 S.Ct. at 918. The exact contours of this body of common law was to be determined by a review of the applicable legislation.
 
 
 21
 The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem.
 
 
 22
 Id.
 
 
 23
 A similar analysis was used in Illinois v. Milwaukee. In that case the Supreme Court was presented with a common law nuisance action brought by the State of Illinois. Illinois brought the action against four cities of Wisconsin, the Sewerage Commission of the City of Milwaukee, and the Sewerage Commission of the County of Milwaukee in an attempt to abate the alleged pollution of Lake Michigan, a body of interstate water. The Court found that Congress had a strong interest in "the quality of the aquatic environment as it affects the conservation and safeguarding of fish and wildlife," 406 U.S. at 102, 92 S.Ct. at 1392, evidenced by legislation such as the Federal Water Pollution Control Act, 62 Stat. 1155, as amended (presently codified at 33 U.S.C. §§ 1251 et seq.) and the Fish and Wildlife Act of 1956, 70 Stat. 1119, 16 U.S.C. § 742a. Undaunted by the absence of an express cause of action in any of these acts covering Illinois' claim, the Court held that one existed in the federal common law. It stated:
 
 
 24
 The remedy sought by Illinois is not within the precise scope of remedies prescribed by Congress. Yet the remedies which Congress provides are not necessarily the only federal remedies available. "It is not uncommon for federal courts to fashion federal law where federal rights are concerned." Textile Workers v. Lincoln Mills, 353 U.S. 448, 457, (77 S.Ct. 912, 918, 1 L.Ed.2d 972.)
 
 
 25
 Id. at 103, 92 S.Ct. at 1392. See also National Sea Clammers Association v. City of New York, 616 F.2d 1222, 1235 (3d Cir. 1980). (After considering the rationale of Illinois v. Milwaukee, this court concluded that there is a "federal common law of nuisance (which) may be enforced by private plaintiffs.")
 
 
 26
 The second group of cases are similar yet distinctive. They deal with the specific issue of whether a federal common law action may be brought by an individual who has been harmed by a violation of legislation designed to protect that individual. The earliest Supreme Court decision of that nature seems to be Texas & Pacific Railway v. Rigsby. The Rigsby Court held:
 
 
 27
 A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law.
 
 
 28
 241 U.S. at 39, 36 S.Ct. at 484. See generally Note, Implied Civil Liability and the Trust Indenture Act, 52 Tul.L.Rev. 299, 309 (1978).
 
 
 29
 This issue has been the subject of a number of Supreme Court decisions, and the applicable analysis has become highly developed. In Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court set forth a four-prong test:
 
 
 30
 First, is the plaintiff "one of the class for whose especial benefit the statute was enacted" that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
 
 
 31
 Id. at 78, 95 S.Ct. at 2088 (emphasis in original; citations omitted). As we have noted, the four-prong analysis of Cort v. Ash is designed to "guide the courts in determining legislative intent." National Sea Clammers Association v. City of New York, 616 F.2d at 1229, citing, Touche, Ross & Co. v. Redington, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), and Trans America Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). The inquiry in a right to contribution claim is somewhat different because the party requesting contribution, by definition, will never be a member of the class protected by the legislation. Indeed that party will always be a member of the class from whom the "especial" class was to be protected. Northwest Airlines, Inc. v. Transport Workers, 606 F.2d 1350, 1354 (D.C. Cir. 1979), cert. granted, 445 U.S. 902, 100 S.Ct. 1077, 63 L.Ed.2d 318 (1980).
 
 
 32
 Although the question presented in each of these cases is different from Murphy's claim we find them helpful in our analysis. For in each of these cases the Court turns to the relevant legislation to determine whether the common law action exists, and ascertains the congressional intent as to both the underlying goals of the legislation and the specific action presented. It is this methodology which we will use in our evaluation of Murphy's contribution claim.
 
 C.
 
 33
 In our review of the legislative history of Title VII we have not found any materials which explicitly indicate whether or not Congress intended for a right of contribution to exist. The absence of such an explicit reference does not end our inquiry, for "the legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question." Cannon v. University of Chicago, 441 U.S. 677, 694, 99 S.Ct. 1946, 1956, 60 L.Ed.2d 560 (1979). As we are "obliged to find an answer (we) must resort to materials from which the Congressional intent can only be inferred." United Parcel Service, Inc. v. United States Postal Service, 604 F.2d 1370, 1383 (3d Cir. 1979) (Higginbotham, J., dissenting).
 
 
 34
 The express terms of Title VII demonstrate a congressional intent that unions be held financially liable with employers for unlawful employment practices. Section 703(a), 42 U.S.C. § 2000e-2(a), proscribes employer discrimination, and section 703(c)(3), 42 U.S.C. § 2000e-2(c)(3), holds a union liable not only for discriminatory actions in which it independently engages, but also when it "cause(s) or attempt(s) to cause an employer to discriminate against an individual . . ." Furthermore, section 706(g) expressly states that a court may award damages for "back pay (payable by the employer, employment agency, or labor organization), . . ." 42 U.S.C. § 2000e-5(g). Under these provisions the union and the employer may be held jointly liable when the unlawful activity was a joint undertaking. See Evans v. Sheraton Park Hotel, 503 F.2d 177 (D.C. Cir. 1974) (employer, local union and international held jointly liable for back pay and attorneys' fees); Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364 (5th Cir. 1974) (company and union held jointly liable for back pay and attorney's fees); Commonwealth of Pennsylvania v. Local 542, International Union of Operating Engineers, 469 F.Supp. 329 (E.D.Pa.1978) (union and company held jointly liable for injunctive relief). These provisions reflect a statutory policy that the responsibility for monetary relief should be borne by both unions and employers to the extent that they are responsible for violations of Title VII. A right of contribution would achieve this goal. In contrast, a holding that there is no right of contribution under Title VII would release some individuals from liability.
 
 
 35
 Other policies underlying Title VII would be served by a right of contribution. In Albemarle Paper Co. v. Moody, 422 U.S. 405, 417, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975) (footnote omitted), the Supreme Court emphasized that Title VII's "primary objective (is) a prophylactic one." The Court stated:
 
 
 36
 It is the reasonably certain prospect of a back pay award that "provide(s) the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history."
 
 
 37
 Id. at 417-18, 95 S.Ct. at 2371-72, quoting United States v. N. L. Industries, Inc., 479 F.2d 354, 379 (8th Cir. 1973). Under a rule of contribution "(b)oth union and employer will know that they both must be vigilant to eschew unlawful discrimination and that the employee's predilections as to whom to sue will not insure either immunity from the mandates of the law." Northwest Airlines, Inc. v. Transport Workers Union of America, 14 E.P.D. P 7730, 5596 (D.D.C.1977), rev'd on other grounds, 606 F.2d 1350 (D.C. Cir. 1979), cert. granted, 445 U.S. 902, 100 S.Ct. 1077, 63 L.Ed.2d 318 (1980). Cf. Globus, Inc. v. Law Research Service, Inc., 318 F.Supp. 955, 958 (S.D.N.Y.), aff'd, 442 F.2d 1346 (2d Cir. 1971), cert. denied, 404 U.S. 941, 92 S.Ct. 286, 30 L.Ed.2d 254 (1971) (implied right of contribution would strengthen "the deterrent impact of the securities law").
 
 
 38
 A right of contribution would also serve the Title VII policy of favoring conciliation and settlement of these claims. "(C)ooperation and voluntary compliance . . . (are) the preferred means for achieving" the goal of equality of employment opportunities. Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). This is shown by the facts of this case. If Murphy had felt that it had no right of contribution against the unions it might have been unwilling to reach a settlement with the plaintiffs. It might have chosen instead to proceed with the litigation so that the unions would be held responsible for a share of the damages. Further, the contribution rule prevents a plaintiff from becoming unjustly enriched either by collusive activity with one of the defendants, or by threatening one defendant that the suit will be brought only against it, thereby forcing an unjustified settlement. See Note, Settlement in Joint Tort Cases, 18 Stan.L.Rev. 486, 490 (1966).[2]
 
 
 39
 A right of contribution would implement the congressional intent to hold both unions and employers liable for unlawful employment practice and would aid the conciliation and settlement goals of Title VII. Thus, we hold that a federal common law right of contribution exists when a defendant charged with a violation of Title VII settles with a plaintiff prior to trial for the full amount of damages and requests contribution from a non-settling co-defendant who is jointly liable.
 
 D.
 
 40
 The dissent argues that by choosing, in this case, the rule of decision which we believe to be the better one we are unjustifiably performing a legislative function. It concedes that we are dealing with a subject matter requiring a uniform federal rule of decision. Thus we and the dissent agree that adoption of a contribution rule is no invasion of an area which state lawmaking authority, legislative or judicial, can claim as its own. The dissent's complaint is that by adopting what we think is the better rule of decision we are invading the exclusive preserve of Congress. If we were to announce a federal rule of decision implied from a constitutional provision,[3] and thus arguably beyond the future control of Congress there might be some merit to the dissent. See Monaghan, Forward: Constitutional Common Law, 89 Harv.L.Rev. 1 (1975). But the rule of decision which we have found to be preferable could be changed by Congress tomorrow.
 
 
 41
 The difficulty with the dissent's argument on legislative function is that it concedes "If it was clear, as my colleagues apparently believe, that a right of contribution would strengthen the deterrent impact of Title VII, then there might be a judicial responsibility to make those rules which are needed to effectuate the significant national policy represented by the statute." At 268. There are countervailing arguments, and the policy choice is a difficult one. But the litigants before us have tendered the issue, and its closeness does not absolve us from the obligation to decide it. Nor does our action become an impermissible encroachment on the legislative branch, merely because of the difficulty of the issue presented. Whether we reject or adopt a contribution rule we must make a choice.
 
 
 42
 If we were to be convinced that a rule prohibiting contribution better served the purpose of Title VII our adoption of that rule would stand in relationship to Congress on exactly the same footing. The logic of the argument that adoption of a rule prohibiting rather than permitting contribution would be less legislative escapes us. Certainly the party whose claim for contribution was rejected would not think we acted any less legislatively in rejecting it. Reliance on deference to the legislative process cannot conceal the fact that the dissent has made such a choice.
 
 IV. Calculation of Liability
 
 43
 Each of the parties argues that if we hold that a right of contribution exists we should order a modification of the judgment because the district court did not apply the correct rules of law when it calculated the International's liability. We do not agree.
 
 
 44
 Using the $648,000 settlement figure which had been reached by Murphy and the class members as the starting point of its calculations, the district court allocated $529,752 to the Title VII claim. It held Murphy responsible for $264,876 of the Title VII liability and the unions the International, Local 940 and Local 249 jointly responsible for the remaining $264,876. The court then subtracted from the unions' share a proportion which it allocated to Local 249, $18,393, and the $4,146 which Local 940 had paid Murphy.[4] Judgment against the International was entered in the amount of $242,337.
 
 A.
 
 45
 The International argues that it should have been assessed for only 50% of the liability which was attributed to the unions because it had been held equally liable with the local unions. We do not agree. The district court found Murphy responsible for half of the Title VII liability and the unions collectively responsible for the other half. The court held the unions liable as a group for half of the damages because they had acted jointly in the collective-bargaining negotiations with Murphy. It was therefore reasonable when it became apparent that Local 940 could pay only $4,146, for the court to hold the International's responsible for the remaining portion.
 
 B.
 
 46
 Murphy argues that the district court should have included in its calculations the interest Murphy paid because it paid the plaintiffs in three installments. We do not agree. The deferred payment schedule benefitted Murphy as it had use of the money during that period. It would have been improper for the court to have permitted Murphy to recoup from the International the monies it paid the plaintiffs for that benefit.
 
 C.
 
 47
 Murphy also objects to the district court's decision not to award it pre-judgment interest. The general rule is that when the damages are ascertainable "with mathematical precision prejudgment interest is awardable as of right." Eazor Express, Inc. v. International Brotherhood of Teamsters, 520 F.2d 951, 973 (3d Cir. 1975), cert. denied, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976). If, however, the claim is not for a liquidated sum, the decision on whether the award interest is within the sound discretion of the court. Id.; Thomas v. Duralite Co., Inc., 524 F.2d 577, 589 (3d Cir. 1975). The district court did not abuse its discretion by not awarding pre-judgment interest. The International did not unduly delay the litigation. An award of interest here would punish the International unfairly because it exercised its right to proceed to trial.
 
 D.
 
 48
 The International argues that its liability should be recalculated because the damage settlement included monies for all females who were employed from July 2, 1965 to January 31, 1971, even though a number of those employees had terminated their employment in the years 1965 through 1968. For the first time in this litigation it argues that the claims of these terminated female employees were erroneously computed into the settlement because those employees could not have filed timely charges in July of 1969 when the EEOC charges underlying this case were filed. The International argues that these claims must be excluded from any back pay calculations since those former employees cannot be members of the plaintiff class relying on Wetzel v. Liberty Mutual Insurance Co., 508 F.2d 239, 246 (3d Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). This case is distinguishable from Wetzel because here the International stated explicitly on the record that it had " 'no objection to the amount of the settlement and/or as to the determination of the legal fees . . . ' " Glus I, App., at 173a. (emphasis added) By agreeing to the amount of the settlement (though of course contesting its liability) the International shrewdly limited its maximum exposure to Title VII damages. The company could have argued that the Equal Pay Act settlement should have been less and the Title VII damages more than $448,000. We adopt the trial judge's response that it is now "too late to raise such an objection."
 
 
 49
 The International's objections must be rejected. On October 2, 1971, at the hearing held by the court on the consent decree, the International, on the record, stated that it had "no objection to the amount of the settlement and/or as to the determination of the legal fees . . ." while it, of course, reserved the right to challenge Murphy's claim for contribution. (Tr. 11). At the hearing, Local 249 indicated that it was adopting the same position. Both of these unions had notice of every hearing and conference held by the court on the settlement procedures, and no objection of any kind was lodged. It is too late to raise such an objection.
 
 
 50
 Id.
 
 
 51
 Further, the settlement figure does not reflect a detailed calculation of the damages due each member of the class as would have been required at a trial. The district court noted that, if calculated, the defendants' liability may have been as high as $800,000. Id. at 176a. The settlement reflects a compromise reached by Murphy and the plaintiff class and it reflects not only mathematical calculations on lost wages, but also the strengths and weaknesses of the legal arguments which could have been made for either party or varying members of the class. We therefore will affirm the district court's reliance on the settlement figure in its calculation.
 
 V.
 
 52
 For the foregoing reasons, we will affirm the judgment of the district court.
 
 
 53
 SLOVITER, Circuit Judge, dissenting.
 
 
 54
 I depart from the opinion of my colleagues because it assumes unto the judiciary the authority to make a federal common law of contribution for a claim arising out of a federal statute which does not expressly provide for contribution, does not imply that contribution is authorized, and does not require contribution for the effectuation of its purposes. I do not disagree with the majority regarding the existence of judicial power to formulate common law. The explanation that Justice Brandeis' broad statement "(t)here is no federal general common law"[1] has opened the way to "specialized federal common law"[2] is now well established.[3] Nor do I disagree with the assumption implicit in the majority opinion that the need for uniformity in application of this federal statute requires us to look to federal, rather than state, law. However, I believe the judicial task of establishing, formulating or discovering federal common law is qualitatively different from the judicial task of filling in the interstices of congressional acts. It is a difference which the majority has not addressed. It underlies my different interpretation of the relevant precedent and leads me to a different result in this case.
 
 
 55
 I believe it will be useful to begin analysis by some review, however cursory, of the instances in which the Supreme Court has assumed lawmaking power. This should assist in placing in perspective the question as to whether exercise of such power is appropriate in this situation. Without undertaking to make a comprehensive categorization, it is frequently suggested or posited that federal common law has been undertaken in the following instances: (1) where the Constitution provides exclusive jurisdiction in the federal courts and no federal statute supplies the rule of law; (2) where a federal statute provides federal jurisdiction but does not supply the rule of law; (3) where a federal statute provides the rule of law but is silent on the existence of a private cause of action; and (4) where a federal statute provides both a cause of action and the rule of law, but has left what has been denominated as "interstices".[4]
 
 
 56
 (1) Disputes Within Exclusive Federal Jurisdiction.
 
 
 57
 The circumstances in which the establishment of federal common law is the most inevitable arise where the federal courts have been given exclusive jurisdiction by the Constitution, but where Congress has not legislated to supply a rule of law. Historically, this has arisen most frequently in instances of disputes between states and in maritime cases.
 
 
 58
 Disputes between the states have often concerned their respective rights to water resources or controversies over boundary lines. One example suffices to illustrate why establishment of federal common law was required as a matter of sheer necessity. In attempting to resolve the dispute between Kansas and Colorado regarding their respective rights in the waters of the Arkansas river, the Court articulated not only the necessity of making a judicial decision but also of formulating federal common law. The Court recognized that if the two states were independent nations, their dispute over whether Colorado could divert river water which arose in that state could be settled by force. Resort to force was eliminated under our federal system of government, so the solution to the dispute must, of necessity, be made by judicial determination. Kansas v. Colorado, 206 U.S. 46, 97, 27 S.Ct. 655, 667, 51 L.Ed. 956 (1907). Since disputes between the states are within the exclusive jurisdiction of the federal courts, there was no other judicial forum which could have heard the dispute.
 
 
 59
 Although establishment of federal common law was not strictly mandated, because presumably the Court could have decided to follow an already established fixed reference point, as a practical matter there was no such fixed reference point. Each state recognized opposing legal principles. Kansas recognized the common law of riparian rights, while Colorado recognized public ownership of flowing waters. Accordingly the Court determined to "apply Federal law, state law, and international law, as the exigencies of the particular case may demand." Kansas v. Colorado, 185 U.S. 125, 147, 22 S.Ct. 552, 560, 46 L.Ed. 886 (1902). The Court recognized that through these successive disputes between the states and its own decisions, it was "practically building up what may not improperly be called interstate common law." Kansas v. Colorado, 206 U.S. at 98, 27 S.Ct. at 667. Subsequent cases have followed that lead. Even when the same rule of common law was applied in both states, the Court held that it was not bound to follow that rule as part of the federal common law. Connecticut v. Massachusetts, 282 U.S. 660, 670, 51 S.Ct. 286, 289, 75 L.Ed. 602 (1931). Neither the statutes nor decisions of either state can be conclusive on the issue of apportionment between the two contesting states because the question is one of federal common law. Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U.S. 92, 110, 58 S.Ct. 803, 810, 82 L.Ed. 1202 (1938).
 
 
 60
 If the interstate nature of a controversy makes it inappropriate that the law of a particular state should govern, a fortiori the necessity to make law in admiralty cases also requires search for a broader base. The Court has frequently stated that "Congress has largely left to this Court the responsibility for fashioning the controlling rules of admiralty law." United States v. Reliable Transfer Co., 421 U.S. 397, 409, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975) (quoting Fitzgerald v. United States Lines Co., 374 U.S. 16, 20, 83 S.Ct. 1646, 1650, 10 L.Ed.2d 720 (1963)). See also Moragne v. States Marine Lines, Inc., 398 U.S. 375, 405 n. 17, 90 S.Ct. 1772, 1790, 26 L.Ed.2d 339 (1970); Kermarec v. Compagnie Gerale Transatlantique, 358 U.S. 625, 630-32, 79 S.Ct. 406, 409-410, 3 L.Ed.2d 550 (1959). In such cases, because of the absence of statutory law, the Court is required to make law, and it deems itself free to formulate flexible and fair remedies in the law maritime. United States v. Reliable Transfer Co., 421 U.S. at 409, 95 S.Ct. at 1714.
 
 
 61
 A similar construction of federal common law has been found necessary when the suit involves the rights and duties of the United States in the issuance of commercial paper, because the application of state law would subject the rights and duties of the United States to exceptional uncertainty. Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 502 (1943). See also Priebe & Sons, Inc. v. United States, 332 U.S. 407, 411, 68 S.Ct. 123, 125, 92 L.Ed. 32 (1947); National Metropolitan Bank v. United States, 323 U.S. 454, 456, 65 S.Ct. 354, 355, 89 L.Ed. 383 (1945); United States v. Standard Rice Co., 323 U.S. 106, 111, 65 S.Ct. 145, 147, 89 L.Ed. 104 (1944). The Court has also stated that federal law should be applied where property rights of the United States are litigated. United States v. Standard Oil Co., 332 U.S. 301, 306, 67 S.Ct. 1604, 1607, 91 L.Ed. 2067 (1947).
 
 
 62
 In yet another area, the Court has iterated the power of the federal courts to make law. In a judicial dispute affecting relations with foreign nations, the Court noted the "uniquely federal" nature of the problems involved. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 424, 84 S.Ct. 923, 938, 11 L.Ed.2d 804 (1964). As in the other instances of establishment of federal common law which fall within this category, the Court might have turned to state law to supply the rule of decision. In the Sabbatino case, the state of New York had previously enunciated the act of state doctrine, which was the doctrine ultimately reaffirmed by the Court in its determination of federal common law. Nonetheless, the Court emphatically asserted that the issue was one of federal law and it undertook to make the substantive law decision:
 
 
 63
 However, we are constrained to make it clear that an issue concerned with a basic choice regarding the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law. It seems fair to assume that the Court did not have rules like the act of state doctrine in mind when it decided Erie R. Co. v. Tompkins. Soon thereafter, Professor Philip C. Jessup, now a judge of the International Court of Justice, recognized the potential dangers were Erie extended to legal problems affecting international relations. He cautioned that rules of international law should not be left to divergent and perhaps parochial state interpretations. His basic rationale is equally applicable to the act of state doctrine.
 
 
 64
 Id. at 425, 84 S.Ct. at 939 (footnotes omitted).
 
 
 65
 The conclusion which emerges from a reading of these cases is that establishment of a federal common law in this category of cases was compelled by considerations of federalism and the constitutional distribution of powers between the federal government and the states.(2) Disputes for which Federal Statutes Create Jurisdiction.
 
 
 66
 A situation somewhat analogous to that posed by cases in the first category is presented when federal common law must be created or determined because a federal statute supplies federal jurisdiction but does not supply the substantive rule of law. The principal example of this arose from section 301(a) of the Labor Management Relations Act of 1947 which, as construed in Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), obliged the courts to fashion substantive federal law from the policy of our national labor law.[5] The Court construed its task and its reference point as follows:
 
 
 67
 The range of judicial inventiveness will be determined by the nature of the problem. Federal interpretation of the federal law will govern, not state law. But state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy. Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights.
 
 
 68
 Id. at 457, 77 S.Ct. at 918 (footnotes omitted).
 
 
 69
 Justice Frankfurter dissented not because he thought state law should be applied, but because he believed that the allocation of institutional function was seriously wrong. Id. at 464-65, 77 S.Ct. at 924-925. The Court might have refused to perform the function imposed on it by Congress because of the non-judicial nature of that function,[6] and presumably, Congress would then have been forced to fill the gap either by creating statutory substantive law or selecting a fixed reference point. However, having failed to do so, the nature of the Court's task in formulating federal common law is not substantially different from that required of it in the situations which come within category 1 above.
 
 
 70
 (3) Implication of a Federal Cause of Action.
 
 
 71
 The third category of cases which have sometimes been referred to as those in which the courts create federal common law deals with the question of the circumstances under which the courts should imply a federal cause of action. In its most frequent form, the question arises as to the implication of a federal cause of action when a statute creates obligations and a substantive rule of conduct, but is silent on whether a private right of action should be permitted for violation of the rule of conduct. The majority opinion refers to the analysis of Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), as helpful because the Court turned to the relevant legislation to determine whether "the common law action exists." At p. 255. However, analytically, the judicial task in framing, creating or uncovering federal common law which must be performed under the instances falling within categories 1 and 2 above is substantially different from that which is required in deciding whether a private right of action should be implied. In the latter situation, there is no need to make law, as such. The fixed reference point is given, since it is the statute which creates the obligation itself. The judicial function is simply the ascertainment of legislative intent, and the rules for its ascertainment have been established by the Court. Indeed, some policy analysis is needed but it is policy analysis in the context of articulated legislative action. However difficult the task may be to divine legislative intent from sometimes obscure origins, the result of the inquiry as to whether a federal cause of action should be implied is a one-word answer, either yes or no. Having decided on that answer, no further judicial legislation is needed.
 
 
 72
 (4) Filling in Statutory Interstices.
 
 
 73
 On any given day in which opinions are announced, the Supreme Court must decide numerous issues of statutory construction. Selecting at random a recent day, February 20, 1980, six of the eight opinions announced involved a Congressional statute and required that the Justices attempt to clarify an issue left unresolved by the statutory language. For example, in Stafford v. Briggs, 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980), the issue was whether a "civil action" as used in section 2 of the Mandamus and Venue Act of 1962, 28 U.S.C. § 1391(e), providing expanded choice of venue in suits against federal officers, was limited to mandamus-type actions. Chief Justice Burger, writing for the majority, noted the familiar tenet of statutory construction that, in interpreting a statute, "the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute . . . and the object and policy of the law . . . ." (quoting Brown v. Duchesne, 60 U.S. 183, 194 (19 How.) 15 L.Ed. 595 (1857)). In Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 527, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980), the Court was obliged to determine whether Section 506 of the Merchant Marine Act, 1936, 46 U.S.C. § 1151 et seq., gave the Secretary of Commerce authority to release subsidized vessels from the foreign-trade only requirement upon full repayment of the subsidy. Despite the absence of any explicit statutory language to that effect, the Court determined that the deletion of the prior explicit authorization did not represent a considered congressional judgment that the transaction should be prohibited. In California Brewers Association v. Bryant, 444 U.S. 598, 100 S.Ct. 814, 63 L.Ed.2d 55 (1980), the Court had to determine the meaning of the words "seniority system" used in Section 703(h) of Title VII of the Civil Rights Act of 1964, which are not comprehensively defined in either the statute or the legislative history. In United States v. Euge, 444 U.S. 707, 100 S.Ct. 874, 63 L.Ed.2d 141 (1980), the language of a section of the Internal Revenue Code, 26 U.S.C. § 7602, requiring persons summoned to "appear" and "give testimony", was construed to authorize the obligation to provide handwriting exemplars although the section does not, by its terms, compel such production.
 
 
 74
 In each of these cases, one could contend that there were statutory interstices. Certainly, no statutory language resolved the issue definitively. However, it would be imparting too much to the Court's interpretive function to view the process as one of lawmaking. It is impossible for the legislature to anticipate every possible issue of interpretation that may arise in the application of a statutory scheme, and hence it is inevitable that there will be unintended gaps in legislation. Other gaps may result from a legislative unwillingness or inability to resolve a delicate issue. The nature and importance of the gaps may vary. But the touchstone of judicial responsibility in dealing with such statutory gaps is to ascertain, to the best extent possible, the Congressional intent, and to interpret the statute in light of the statutory scheme. There is a fixed reference point the statutory provision, other language in the statute, and the legislative intent which delimits the parameter of judicial action.
 
 
 75
 One need only compare that limited task with the one assumed by the Supreme Court when it makes federal common law to see the magnitude of the difference. When the courts act as lawmakers they are free to roam through the fields of scholarly lore and policy considerations to select rules they deem appropriate. When the issue is not controlled by statutory or constitutional provisions or by past decision, the court is free to select the rule which it believes is the fairest and easiest to apply administratively. See Texas v. New Jersey, 379 U.S. 674, 677, 85 S.Ct. 626, 628, 13 L.Ed.2d 596 (1965). It can accept those arguments it deems sound, and, by judicial fiat, impose that law on the parties. See United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).
 
 
 76
 There is no such freedom in the judicial task of filling in interstices of federal statutes where we must follow the lodestar of Congressional intent. The difference between the two tasks is in large part a function of different constitutional underpinnings. When the federal courts fashion federal common law as lawmakers, they are acting to assert the supremacy of national law which is a fundamental rock on which our federal system is hewn. On the other hand, when the federal courts fill in interstices or attempt to determine if a private right of action should be implied from a federal statute, the courts are acting on a far different basis that which stems from the constitutional allocation of power among the branches of government.
 
 
 77
 In the cases which fall within categories 3 and 4, there is no issue whether federal law should govern. That decision was already made by Congress, whose intent must be carried out if the separation of powers given to each branch of government are to be observed. In contrast, the formulation of federal common law does not on its face raise any issue of allocation of powers. In fact, in these cases where common law has been made, one may consider the courts' lawmaking as implicitly authorized by Congress because it failed to fill in the gap left by the constitutional grants of jurisdiction. Congress could act, if it deemed it appropriate to do so, since it is unlikely that the federal judiciary has broader lawmaking power in federal matters than Congress has.[7] Although there has been some suggestion that the Court's opinion in Sabbatino was asserting judicial power to make law independent of the other branches of the national government, there are other more conservative bases on which to read that opinion.[8]
 
 
 78
 The majority opinion relies on the decision in Illinois v. City of Milwaukee, Wisconsin, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), as authority for the power it asserts to make common law when "necessary for the fulfillment of the legislative purpose." At p. 253. It appears that the majority reads that decision as one falling within the category authorizing courts to fill in statutory interstices. I do not read the case that way, but instead believe that it falls within the category 1 cases where there is federal jurisdiction but no applicable federal statute. In that case, Illinois sued Milwaukee to abate the public nuisance caused by its discharge of pollution into Lake Michigan, a body of interstate water. There was no federal statute which applied. Had there been, the issue might have been whether private suit was authorized, as in Cort v. Ashe, but there would have been no occasion for the Court to decide whether it had original jurisdiction on the basis of plaintiff's status as a state.
 
 
 79
 Furthermore, if there had been an applicable statute, that statute would have qualified as a "law" of the United States within the meaning of 28 U.S.C. § 1331(a) (1976), and there would have been no occasion for the Court to decide that federal common law is within the meaning of "laws" for purposes of § 1331(a). Although there were several congressional statutes which touched upon the field of water pollution, their inapplicability obliged the Court to decide whether there was a federal common law of nuisance. It did so by relying on the cases previously discussed here in connection with category 1: "When we deal with air and water in their ambient or interstate aspects, there is a federal common law . . .," id. at 103, 92 S.Ct. at 1392.[9] The Court specifically recognized the inapplicability of any federal statute:
 
 
 80
 It may happen that new federal laws and new federal regulations may in time pre-empt the field of federal common law of nuisance. But until that comes to pass, federal courts will be empowered to appraise the equities of the suits alleging creation of a public nuisance by water pollution. . . . There are no fixed rules that govern; these will be equity suits in which the informed judgment of the chancellor will largely govern.
 
 
 81
 Id. at 107-08, 92 S.Ct. at 1395 (footnotes omitted). The basic difference between the situation in Illinois v. City of Milwaukee, Wisconsin and that in the cases of statutory interstices, such as we have here, is that in the latter category, federal courts are not free to "appraise the equities", but must leave that function to Congress.
 
 
 82
 In fulfilling our function as interpreters, we must be guided by the principle that we must not overstep into the legislature's domain, for reasons of both principle and pragmatics. As Judge Friendly has commented:
 
 
 83
 (T)he legislature's superior resources for fact gathering; its ability to act without awaiting an adventitious concatenation of the determined party, the right set of facts, the persuasive lawyer, and the perceptive court; its power to frame pragmatic rules departing from strict logic, and to fashion a broad new regime or to bring new facts within an existing one; its practice of changing law solely for the future in contrast to the general judicial reluctance so to proceed; and, finally, the greater assurance that a legislative solution is not likely to run counter to the popular will: all these give the legislature a position of decided advantage, if only it will use it.[10]
 
 
 84
 Turning to the statute at hand, it is questionable whether there even exists in Title VII of the Civil Rights Act of 1964 the statutory interstice found by the majority. The statute establishes a comprehensive program designed to eliminate discrimination of the type specifically addressed. It establishes the rule of law, administrative agency enforcement, private rights of action, and specified procedures which must be followed. It can operate effectively, and indeed has operated effectively since its enactment, without a right of contribution by one defendant against another defendant. None of the compulsion that requires the courts to act, either as legislators or as interpreters, is applicable here. Although the refusal to take action is, of course, in itself action, there is a substantial difference between the affirmative action needed to make law or interpret equivocal statutory language and the action which consists merely of declining to alter the status quo.
 
 
 85
 Even if we were to apply the statutory interpretive rules used when there are, in fact, interstices, they do not lead to the implication of a right of contribution in Title VII. Congress, at the time of its enactment, was well aware that the traditional rule applicable in federal courts was that no right of contribution existed. This had been established by the Supreme Court when it said, "In the absence of legislation, courts exercising a common-law jurisdiction have generally held that they cannot on their own initiative create an enforceable right of contribution as between joint tortfeasors." Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 285, 72 S.Ct. 277, 279, 96 L.Ed. 318 (1951). The then prevalent view was articulated by this court when it arose, as it frequently did, in the context of a claim for contribution under the federal antitrust laws:
 
 
 86
 Since both sets of claimed torts are declared in the complaints to be actionable solely by reason of federal law there would seem to be strong justification for appellee's contention that the tort asserted to lie in the third party complaint is governed by federal common law with no right of contribution between tort feasors.
 
 
 87
 Goldlawr, Inc. v. Shubert, 276 F.2d 614, 616 (3d Cir. 1960) (footnotes omitted).
 
 
 88
 The rule of no contribution in antitrust actions has been consistently followed by the federal courts, with but one recent exception. Olson Farms v. Safeway Stores, (1979) 2 Trade Cas. (CCH) P62,995 (10th Cir. 1979); Beef Industry Antitrust Litigation v. Meat Price Investigators Association, 607 F.2d 167 (5th Cir. 1979); Wilson P. Abraham Construction v. Texas Industries, Inc., 604 F.2d 897 (5th Cir. 1979); El Camino Glass v. Sunglo Glass Co., (1977) 1 Trade Cas. (CCH) P61,533 (N.D.Cal.1976); Sabre Shipping Corp. v. American President Lines, Ltd., 298 F.Supp. 1339 (S.D.N.Y.1969); contra, Professional Beauty Supply, Inc. v. National Beauty Supply, Inc., 594 F.2d 1179 (8th Cir. 1979).[11] See Sellers, Contribution in Antitrust Damage Actions, 24 Vill.L.Rev. 829 (1979).
 
 
 89
 I do not view the decision in Cooper Stevedoring Co. v. Fritz Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974), as in any way inconsistent with the general principle that contribution is usually to be found in a statute, if at all. In Cooper, the Court was applying the well-established maritime rule allowing contribution between joint tortfeasors. Id. at 106, 94 S.Ct. at 2174. Cooper belongs to that category of maritime and admiralty cases where the Court is free to make law or, as it did there, follow well-established precedent. In fact, the Court in Cooper cited Halcyon as reflecting the Court's disinclination to allow contribution where it might be inconsistent with the balance struck by Congress in enacting legislation. Id. at 112, 94 S.Ct. at 2177.
 
 
 90
 Congress was not unaware that, in order to provide for contribution in a claim based on a federal statute, it must make explicit provision for such in the statute itself. That is precisely what Congress did in the Securities Act of 1933, when it provided that "All or any one or more of the persons specified in subsection (a) of this section shall be jointly and severally liable, and every person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment . . . ." 15 U.S.C. § 77k(f) (1976). Provisions for contribution similar to this also appear in the Securities Exchange Act of 1934. See 15 U.S.C. §§ 78i(e), 78r(b) (1976). Whatever force there may be in the argument that the subsequent enactment of a specific statutory provision in the Securities statutes cannot shed light on Congressional intent as to the antitrust laws, enacted more than two decades earlier,[12] it is inapplicable to Title VII which was itself enacted substantially after Congress framed the specific provisions for contribution in the Securities Laws.
 
 
 91
 The Supreme Court has recently had occasion to consider the propriety of changing a judicially created rule on which Congress may have relied when enacting legislation. In Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), the Court was asked to impose a proportionate-fault rule in maritime law. After determining that it could not find such an intent in the Congressional statute, the Court was obliged to determine whether it should nonetheless make the change in light of "sound arguments supporting division of damages between parties before the court on the basis of their comparative fault." Id. at 271, 99 S.Ct. at 2762. It declined to do so. It was "mindful that here we deal with an interface of statutory and judge-made law", id. at 272, 99 S.Ct. at 2762-63, and concluded:
 
 
 92
 Once Congress has relied upon conditions that the courts have created, we are not as free as we would otherwise be to change them. A change in the conditions would effectively alter the statute by causing it to reach different results than Congress envisioned.
 
 
 93
 Id. at 273, 99 S.Ct. at 2763. One can assume in the absence of contrary indication, that when it enacted Title VII Congress both was aware of and relied on the established rule that contribution would not be implied in the absence of a statutory provision.
 
 
 94
 Imposition by the judiciary of a rule of contribution in Title VII cases would raise numerous administrative questions which we are ill-equipped to decide. For example, if contribution is to be implied, should it be equal contribution or should it be based on proportionate fault? Should responsibility be allocated in some fashion among intentional and unintentional joint tortfeasors, such as was formerly found in the Uniform Contribution Among Tortfeasors Act? See 129 Uniform Laws Ann. 233 (1975). Should the settling defendant be protected from liability for contribution to later sued defendants? Although the majority attempts to face some of these issues, they are on their face, hardly suitable for judicial determination in the context of a fixed statutory scheme. As Justice Brennan commented recently in another context, "To suggest the elements of such a test, however, is to expose how ill-suited a court is to define them adequately. It is Congress which has the resources and responsibility to fashion a rule . . . that comports with the objectives of the . . . Act." Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136, 160, 100 S.Ct. 960, 974, 63 L.Ed.2d 267 (1980) (concurring and dissenting).
 
 
 95
 In his respected and often cited article on judicial lawmaking and statutory interpretation, Justice Schaefer recognized that it is inevitable that judges should make law. However, it may have been the difficulties of balancing the equities and administrative decisions required to formulate a law of contribution that led Justice Schaefer to use contribution as an illustration of a situation in which the courts should refrain from acting in the absence of legislative command. He writes:
 
 
 96
 Two more commonplace situations may also serve as illustrations. With respect to both of them I think there would be general agreement as to the unsatisfactory quality of the existing rule. At common law there is no contribution among joint tortfeasors. When the negligence of more than one person contributes to the injury to the plaintiff, each of the guilty parties is liable for the full extent of the resulting damage, regardless of the degree to which the damage resulted from his negligence. And the plaintiff may have his choice among the defendants. One joint tortfeasor, perhaps least responsible morally and legally, but typically most responsible financially, can be called upon to satisfy the entire judgment. And, having done so, he has no right to call upon his codefendant to shoulder a part of the burden. In a few jurisdictions the problem has been met by provisions requiring contribution among joint tortfeasors. So far as I am aware, that change in the law has always been accomplished by statute. The reason, I think, is that the problem is not self-contained. It cannot be satisfactorily solved by judicial announcement of a rule requiring contribution among joint tortfeasors. To operate satisfactorily a system of comparative negligence would be necessary with resulting complication as to jury verdicts. The other common-law rule is that a judgment against two joint tortfeasors is to be regarded as a unit. If the judgment is set aside as to one defendant, it must be set aside as to all. That doctrine is obviously unsatisfactory, and courts have not hesitated to depart from it. The problem is self-contained, and the rule with respect to the joint judgment can be eliminated without affecting other areas.
 
 
 97
 Schaefer, Precedent and Policy, 34 U.Chi.L.Rev. 3, 13 (1966) (footnotes omitted) (emphasis added).
 
 
 98
 If it was clear, as my colleagues apparently believe, that a right of contribution would strengthen the deterrent impact of Title VII, then there might be a judicial responsibility to make those rules which are needed to effectuate the significant national policy represented by the statute. In that situation we would be acting in a manner consistent with our interpretation of Congressional intent, rather than legislating a rule which the majority believes is demanded by "fundamental fairness." At 252. However, I do not share the belief that contribution is required for this purpose. There is a possibility that it would have the opposite effect. It might deter settlement if a settling defendant would remain liable to nonsettling defendants for contribution, since it would preclude the most meaningful characteristic of settlement: final and complete termination of involvement in the case. See Sabre Shipping Corp. v. American President Lines, Ltd., 298 F.Supp. at 1346. On the other hand, a rule against contribution might very well encourage deterrence because potential violators would be more likely to refrain from violations if they knew that any injured party could impose the full burden of recovery on any one of them even though it played only a relatively minor part in the activity. See Professional Beauty Supply, Inc. v. National Beauty Supply, Inc., 594 F.2d at 1189 (dissenting opinion), quoted in Olson Farms, Inc. v. Safeway Stores, Inc., (1979) 2 Trade Cas. P62995 at 79,703.
 
 
 99
 In sum, the arguments as to the effect of a rule of contribution are inconclusive. They may cut either way. They encompass policy judgments and considerations which Congress should evaluate and adjust. While I believe my two colleagues are at least as able to perform that task as are many of the legislators, they have not been given the responsibility to do so under our constitutional allocation of powers. I agree with Judge Gibbons' comments when he argued we should refuse to create a federal common law of immunity for army surgeons: "Instead of deferring to future Congressional judgment on the creation of absolute immunity in this kind of suit, the majority has chosen to weigh the competing policy considerations and to make an essentially legislative judgment. It has done so, however, without the benefit of the interplay of the various competing interests which, by design, appropriately occurs within the legislative arena. . . ." Martinez v. Schrock, 537 F.2d 765, 775 (3d Cir. 1976) (dissenting).
 
 
 100
 Under the circumstances presented in this case, we should not engage in lawmaking as a naked exercise of power where we have neither constitutional nor statutory authority, but should leave to Congress any action which would drastically change the current rule.
 
 
 
 [1]
 For the first time Murphy argues that even if the district court erred by concluding that it had jurisdiction under Title VII we should hold that the district court had jurisdiction because Murphy's claim sounds in federal common law and thus an independent basis for jurisdiction exists in 28 U.S.C. § 1331. As our discussion below indicates, we agree that Murphy's right to contribution arises from the federal common law. As such section 1331 might have provided the basis for jurisdiction. See Illinois v. Milwaukee, 406 U.S. 91, 98-102, 92 S.Ct. 1385, 1390-1392, 31 L.Ed.2d 712 (1972). But see Northwest Airlines, Inc. v. Transport Workers Union of America, 606 F.2d 1350, 1356 (D.C.1979), petition for cert. filed, --- U.S. ----, 100 S.Ct. 1077, 63 L.Ed.2d 318 (1980) (court's jurisdiction over right of contribution for Title VII claim may depend on timeliness of the suit). We do not decide that issue because jurisdiction exists under Title VII and because Murphy failed to plead section 1331 as a jurisdictional base
 
 
 [2]
 Some critics of the contribution rule argue that contribution in fact serves to restrict settlements. They assert that a settling defendant may be fearful of settling and being held liable in contribution for a portion of an award assessed against a co-defendant who went to trial. We do not agree that the potential for this problem should destroy the right entirely. That problem has been dealt with by courts who have been faced with requests for contribution involving settlements in other areas of the law. See, e. g., McLean v. Alexander, 449 F.Supp. 1251 (D.Del.1978), rev'd on other grounds, 599 F.2d 1190 (3d Cir. 1979) (securities law)
 
 
 [3]
 See, e. g., Riley v. Chester, 612 F.2d 708 (3d Cir. 1979) (implying a federal common law press privilege from the first amendment)
 
 
 [4]
 We summarized the calculations in the first appeal as follows:
 The district court excluded the $100,000 from the amount to be allocated for contribution ruling that a labor organization could not be liable under the Equal Pay Act. The court found the settlement between Murphy and the plaintiffs to span a period of time beginning July 1, 1965 and ending June 30, 1971, a period of 72 months. The court found the union collectively liable for $224,000, 50% of the plaintiffs' $448,000 Title VII recovery. The International's share of the responsibility for the Title VII recovery was 67/72 since it was for 67 months of the 72 month period that the International and Local 940 represented Murphy's employees. Thus, the International's liability for the Title VII claim was $208,444, or 67/72's of $224,000. For the purpose of contribution attorneys' fees were apportioned. The district court determined that of the $100,000 attorneys' fees $81,752 was attributable to the Title VII claims. This was done by taking the ratio of the Title VII recovery, or $448,000, to total recovery, or $548,000, and the total amount of attorneys' fees:
 Title VII Recovery ($448,000)
 Total Recovery ($548,000)
 =
 Title VII Attorneys' Fees
 Total Attorneys' Fees ($100,000)
 The International's contribution to the attorneys' fees for the Title VII recovery was based on the same percentage, 67/72 used to determine its Title VII contribution. Thus, the court below found the International liable for $38,039, 67/72's of $40,876, 50% of the Title VII attorneys' fees, or $38,039. Credited against the International's liability was the $4,146 settlement Murphy received from Local 940. A judgment in favor of Murphy and against the International was entered in the sum of $242,337 on April 29, 1976.
 Glus v. G. C. Murphy Co., 562 F.2d at 884 (footnote and citations omitted).
 
 
 [1]
 Erie R. R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938)
 
 
 [2]
 Friendly, In Praise of Erie And of the New Federal Common Law, 39 N.Y.U.L.Rev. 383, 405 (1964)
 
 
 [3]
 See, e.g., cases referred to in Rules of Decision in Nondiversity Cases, 69 Yale L.J. 1428, 1434 (1960)
 
 
 [4]
 These categories are in large part a paraphrase of those referred to in Friendly, note 2 supra, at 421
 
 
 [5]
 It may be possible to view the statute giving the federal courts jurisdiction of maritime claims "saving to suitors in all cases all other remedies to which they are otherwise entitled", 28 U.S.C. § 1333 (1976), as another instance of Congressional authorization to the judiciary to fashion federal common law. However, the federal courts were vested with jurisdiction of admiralty claims by Article III, section 2 of the Constitution, and hence the need to undertake fashioning appropriate rules of law would be the same even without the federal statute
 
 
 [6]
 See Bickel and Wellington, Legislative Purpose and the Judicial Process: The Lincoln Mills Case, 71 Harv.L.Rev. 1, 14-35 (1957), where the authors suggest that the appropriate disposition of Lincoln Mills in view of the institutional incapability of the court to perform the function placed on it by Congress would have been to dismiss the suit for lack of jurisdiction without questioning the constitutional basis for the statutory section
 
 
 [7]
 See Friendly, note 2 supra at 395
 
 
 [8]
 See Henkin, The Foreign Affairs Power of the Federal Courts : Sabbatino, 64 Colum.L.Rev. 805 (1964)
 
 
 [9]
 The courts of appeals have divided over whether the federal common law of nuisance can be applied to intrastate pollution of navigable waters. Compare Illinois v. Outboard Marine Corp., 619 F.2d 623 (7th Cir. 1980) with Committee for the Consideration of the Jones Falls Sewage System v. Train, 539 F.2d 1006 (4th Cir. 1976) and Reserve Mining Co. v. EPA, 514 F.2d 492 (8th Cir. 1975)
 
 
 [10]
 Friendly, The Gap in Lawmaking Judges Who Can't and Legislators Who Won't, 63 Colum.L.Rev. 787, 791-92 (1963) (footnotes omitted)
 
 
 [11]
 Suit by an employer against an employee for indemnification for antitrust penalties, damages and expenses incurred because of the employer's antitrust liability based on the employee's activities was permitted in Wilshire Oil Co. v. Riffe, 409 F.2d 1277 (10th Cir. 1969). See Paul, Contribution and Indemnification Among Antitrust Coconspirators Revisited, 41 Fordham L.Rev. 67 (1972)
 
 
 [12]
 In Professional Beauty Supply, Inc. v. National Beauty Supply, Inc., 594 F.2d 1179, 1183-84 (8th Cir. 1979), the court opined that "the presence of contribution provisions in the security laws is some indication that if the question were presented today, Congress would include a right to contribution as part of the antitrust laws."