HARMAN ELECTRIC COMPANY

v.

FIRST REAL ESTATE INVESTMENT CO. et al.

HILBERT COMPANY, Inc.

v.

DALE HOWE CORPORATION et al.

Civ. A. Nos. 66-71, 67-71.

United States District Court,
W. D. Pennsylvania.

May 31, 1972.

No. 66–71:

Warren W. Bentz, Erie, Pa., for Harman Electric Co.

James D. McDonald, Jr., Erie, Pa., B. Richard Burdman, Youngstown, Ohio, for defendants.

No. 67–71:

Thomas E. Doyle, Erie, Pa., for Hilbert Co., Inc.

David S. Gifford, John M. Wolford, Charles Vendetti, Erie, Pa., for defendants.

## OPINION AND ORDER DIRECTING DISTRIBUTION OF FUND

KNOX, District Judge.

This rather complicated matter, arising from the issuance of writs of foreign attachment in accordance with Pennsylvania Procedure and Federal Rule of Civil Procedure 64 whereby the rents payable by tenants in an apartment house in Millcreek Township, Erie County, Pennsylvania, were attached by the United States Marshal, is before the court on petitions for final distribution of the fund derived from collection of rents. Prior claims against the fund have been paid by stipulation of the parties and there now remains a balance of $3,223.19. The questions now before the court are: (1) Claims of the United States Marshal for poundage in the amount of $632.15; (2) Claim of Harman Electric Company attaching creditor in Civil Action 66–71 for payment of the balance of its claim in the amount of $2,591.04 and (3) Claim of defendant First Real Estate Investment Company that the balance of the fund should be turned over to it as the present landlord in possession succeeding to the rights of

the prior landlords, Dale-Howe Management Corporation and/or Dale-Howe Corporation. These prior landlords had defaulted and were ousted from possession pursuant to terms of the lease and notice of default dated August 20, 1971, effective September 10, 1971.

Plaintiff Harman Electric Company, a Pennsylvania corporation, is an electrical contractor which performed the electrical work on the construction of the apartment house in question known as Presque Isle Village Apartments recently constructed and located near the entrance to Presque Isle State Park in Erie County. Harman's complaint avers that its work was done upon solicitation of Dale-Howe Corporation, an Ohio Corporation, in June of 1970 but that their actual contract for the work was given them by Jamestown Constructors, Inc., which it is averred is an alter ego for Dale-Howe Corporation, and that all invoices were rendered to and paid by Dale-Howe Corporation. The complaint recites a series of conveyances on September 4, 1970, whereby title to the real estate was transferred first to one Weinberg then by Weinberg to Dale-Howe Corporation and by Dale-Howe Corporation back to Weinberg and Hollander subject to a mortgage which had been placed upon the property. On March 11, 1971, by deed recorded April 13, 1971, in the Erie County Recorder's Office, Weinberg and Hollander conveyed to defendant First Real Estate Investment Company who in turn on the same day executed an agreement of lease of the premises to Dale-Howe *Management* Corporation which in turn subleased to the apartment house tenants.

On August 12, 1971, Harman issued in this proceeding a writ of foreign attachment directing the Marshal to attach the real estate and also rentals due and to become due from the tenants in the apartments. Seventeen defendants are named including as noted First Real Estate Investment Company and Dale-Howe Corporation, Jamestown Constructors, Inc. and numerous other corporations and individuals. This was necessitated by the complicated nature of the money transactions pertaining to this apartment house. Pursuant to court order, the writ was authorized to be served on Dale-Howe Corporation through the Secretary of the Commonwealth of Pennsylvania. The writ was also served on Attorney Chester J. Vendetti in Erie, August 12, 1971, he apparently acting as attorney for the defendants Dale-Howe Corporation and their related interests. The motion filed by defendant First Real Estate Investment Company, claimant to the fund, recites that the funds were attached on or about August 18, 1971. On September 7, 1971, with the consent of all parties, the Honorable Gerald J. Weber of this court approved an order submitted by the United States Marshal ordering the tenants to continue to make rental checks payable to Dale-Howe Corporation and hand the checks to the resident managers of the project Mr. and Mrs. Donald McMillan who were required to hold and sequester these rental payments until otherwise directed by the court. These funds were deposited by Mr. and Mrs. McMillan according to stipulation filed by the parties in a bank account of Dale-Howe Corporation in the First National Bank of Pennsylvania. It is further stipulated that Dale-Howe *Management* Corporation was the tenant of First Real Estate Investment Company and leased the individual units at the apartment to individual subtenants. It is further stipulated "The rents from the subtenants were received by Dale-Howe *Management* Corporation and some or all of these rents were deposited in the accounts of Dale-Howe Corporation by Dale-Howe *Management* Corporation." By virtue of the writ of foreign attachment issued August 18, 1971, the bank account of Dale-Howe Corporation in the First National Bank of Pennsylvania was likewise attached.

On January 13, 1972, pursuant to orders of this court, all funds were trans-

ferred to the name of First National Bank of Pennsylvania, Trustee.

On October 22, 1971, default judgment was duly entered against Dale-Howe Corporation by Harman in the amount of $21,828.04. Meanwhile as noted, on August 20, 1971, defendant First Real Estate Investment Company sent a notice of termination of the lease agreement dated March 11, 1971, to Dale-Howe Management Corporation. This notice was sent pursuant to Section 23.-01(A) of the lease [1] and under the provisions of 23.02, it was provided that in the case of such notice "The term hereby demised shall expire and terminate on the date specified in such notice."[2]

Reference should also be made to Section 23.01(H) [3] providing for default in case a levy under execution or attachment against the tenant is not vacated within a period of *30 days*. The discrepancy between 20 and 30 days is of no importance since it is stipulated that on the expiration of the 20 days on September 10, 1971 "there was in the account of First National Bank of Pennsylvania to the account of Dale-Howe Corporation the sum of $6,067.13", more than sufficient to pay the present claims against the funds.

Both of the above-captioned cases were later assigned to this member of the court and by subsequent proceedings, stipulations were entered into between the parties whereby the claim of

Hilbert Company, Inc., plaintiff in Civil Action 67–71 Erie, which had issued foreign attachment seizing these rents also on August 17, 1971, was paid in full and $20,000 was paid on account of the Harman claim. Various other small claims were paid and the balance in the fund which had built up as a result of payments of sundry rentals to a total of approximately $75,000 was reduced to the amount in question, viz: $3,223.19. This amount remained after further payment pursuant to an order of February 29, 1972, of the sum of $30,672.95 to defendant First Real Estate Investment Company on account of expenses incurred in keeping the property operative while the litigation proceeded.

As stated, there are claims against the remaining balance by the United States Marshal, by First Real Estate Investment Company and by the plaintiff Harman for the balance of its claim in the amount of $2,591.04 being $1,828.04 principal and $763 interest. We have held hearings with respect to the same after notice being given to all parties concerned and a stipulation has been filed by the attorneys for Dale-Howe Corporation and Dale-Howe Management Corporation certifying that the rents owed the First Real Estate Investment Company on September 10, 1972, were in excess of the amount then in the bank account and certifying that these corporations have no interest in the fund.

---

1. "(A) Failure of tenant to pay any installment of rental or any other payments of money, costs, or expenses herein agreed to be paid by tenant, when due, and the continuance of such failure for a period of 20 days after written notice from landlord specifying such failure."

2. "If an event of default shall occur, landlord, at any time thereafter, may at its option give written notice to tenant stating that this lease and the term hereby demised shall expire and terminate on the date specified in such notice, and upon the date specified in such notice, this lease and the term hereby demised, and all rights of the tenant under this lease

shall expire and terminate as if that date were the date herein definitely fixed for the termination of the term of this lease, and tenant shall quit and surrender the premises but tenant shall remain liable as hereinafter provided; provided, however that tenant shall have the right to cure the event of default prior to the expiration of the time specified in said notice."

3. "(H) If a levy under execution or attachment shall be made against tenant or its property and such execution or attachment shall not be vacated or removed by court order, bonding or otherwise within a period of 30 days."

(1) *Claim of the United States Marshal.* The United States Marshal's claim for $632.15 is based upon 28 U.S.C. § 1921. We are particularly concerned with the sixth paragraph of this section which reads:

"For seizing or levying on property (including seizures in admiralty), disposing of the same by sale, setoff, or otherwise and receiving and paying over money, commissions of 3 per centum on the first $1,000 of the amounts collected and 1½ per centum on the excess of any sum over $1,000. *If not disposed of by marshal's sale, the commission shall be in such amount as may be allowed by the court.* In all cases in which the vessel or other property is sold by a public auctioneer, or by some party other than the marshal or his deputy, the commission herein authorized to be paid to the marshal shall be reduced by the amount paid to said auctioneer or other party." (Emphasis added.)

We have requested the United States Marshal to file a detailed statement of his claim showing his calculations but to date we have not received the same. He is claiming $632.15. We are unable to determine the basis of his calculation but, in any event, he appears to be relying upon the full percentages set forth in the first sentence of this paragraph. The United States Attorney has submitted a brief on behalf of the Marshal claiming that this is proper. On the other hand, claimants argue that the matter is for the discretion of the court pursuant to the sentence italicized above and that the Marshal should not be allowed his full commission at the normal rate because the funds did not actually pass through his hands and there was no sale. It should be observed that the Marshal was paid for his services in serving the writs and that it was pursuant to a court order sought by him that the arrangement was made for the payment of the funds into the hands of the resident managers of the project

who in turn deposited them in the bank account of Dale-Howe Corporation. It appears that none of these funds passed through the Marshal's hands.

■ We have examined the legislative history of this section of the code as best we can and can find nothing which indicates any legislative interpretation of the italicized sentence in question and there seems to be no clear precedent. The United States Attorney's Office contends that the sentence in question is a contradiction to the preceding sentence and that the rates fixed in the preceding sentence are in all cases controlling.

It appears from 1950 U.S.Code Congressional Service p. 3690 that previously Marshal's fees were fixed as the same as sheriff's in the respective states where the service was rendered except in admiralty cases where a uniform rate was charged and the purpose of the act was to provide uniform rates for Marshal's services on all cases. There is further legislative history in 1962 U.S. Code Congressional & Admin.News, page 2240, which indicates that the only purpose of the Amendment of 1962 was to increase the amounts.

The United States Attorney cites the Georgeanna, 31 F. 405 (D.C.S.D.N.Y. 1887) as sustaining the Marshal's position. Therein the court said:

"Upon delivering the property to the person entitled to it, he (the Marshal) is therefore entitled to payment of his fees for preserving it, because he kept it for the recipients benefit." (at 407).

We have no quarrel with this statement of the law but consider it inapplicable in the present case. Rather, we think this case is governed by Ringgold v. Lewis, Fed.Cas.No.11,847, 3 Cranch CC 367 (1828) holding that the Marshal is not entitled to poundage on an attachment of money not taken into his actual possession so as to make him chargeable therefor. In the instant case, the money was paid under the court order to the

resident managers and by them deposited in the bank and there was nothing to make the Marshal chargeable therefor except that it was done at his direction with the concurrence of the court.

■ Under Rule 54(d) [4] as well as under the statute, we consider that we have discretion and since the Marshal did not have actual custody of the money and did not actually collect the rents and had been paid for his services in serving the writs, we hold that a fair allowance for poundage would be ½ the amount claimed, viz: $316.08.

(2) *Claim of Harman Electric Company.* We must first look at whom this claim was against. While the order for the work was given by Jamestown Constructors, Harman claims that the work was originally done under bids solicited by Dale-Howe Corporation and that in any event Jamestown Constructors was a mere tool or alter ego of Dale-Howe Corporation, then the owner of the property. We need not concern ourselves with this question because a default judgment was properly entered against Dale-Howe Corporation and on the record this defendant has disclaimed any interest in these funds. Plaintiff did not issue a writ against Dale-Howe *Management* Corporation but did attach the funds of Dale-Howe Corporation and its bank account. The rents had been and were being paid into this bank account and the attachment was against the tenants. We must therefore treat the funds attached and paid into the account prior to September 10, 1971, as those of Dale-Howe Corporation. Since it is agreed that on September 10, 1971, the amount in Dale-Howe Corporations' bank account was $6,067.13, more than

enough to cover the claim of Harman, it would seem obvious that Harman is entitled to be paid out of this fund.

First Real Estate Investment Company, however, claims that under the terms of the lease and as a result of giving notice of termination on August 20 and there having been defaults for two or three months previous to this date, the money is theirs.

■ As we read the terms of the lease incorporated in footnotes 1, 2 and 3, First Real Estate Investment had no right to enter into possession of the premises until 20 days from the date of the notice until September 10, 1971. Until that time, the rents would clearly be the property of Dale-Howe Corporation. First Real Estate, however, claims that under Pennsylvania law, they had a right to levy a distraint for rent in arrears and were therefore entitled to the landlord's preference in proceeds of execution under 68 Purdons Pa.Statutes § 321 (Act June 16, 1836, P.L. 755, Section 83).

"*Landlord's preference in proceeds of execution.* The goods and chattels being in or upon any messuage, lands, or tenements, which are or shall be demised for life or years, or otherwise taken by virtue of an execution, and liable to the distress of the landlord, shall be liable for the payment of any sums of money due for rent at the time of taking such goods in execution: Provided, That such rent shall not exceed once year's rent. 1836, June 16, P.L. 755, Sec. 83."

The history of this statute and its predecessors going back to the Act of English Parliament 8 Anne. 14 is given

4. "Costs. Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law. Costs may be taxed by the clerk on one day's notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court. As amended Dec. 27, 1946, eff. March 19, 1948; April 17, 1961, July 19, 1961."

in Ege v. Ege, 5 Watts 134 at 138 (Pa. 1836).[5]

It will be noted that this statute only gives the landlord a preference in "goods and chattels" taken by virtue of an execution and *"liable to the distress of the landlord"*. It has been held by the Pennsylvania Supreme Court impliedly in Ege and more clearly in Martin's Appeal, 5 Watts and Sargeant 220 (Pa.1843) that the section only applies to goods which are liable to the distress of the landlord. The question is what is subject to distress. This section apparently only applies to tangible personal property and historically in Pennsylvania the right of distress has been given the landlord only for personal property located on the premises. See Pa. Landlord and Tenants Act 1951, 68 Purdon's Pa.Statutes 250.302. (Note: 68 Purdon's Pa.Statutes 322 only applies where there has been an actual distress at the time of the levy. There had been none here.)

In the instant case, if Dale-Howe *Management* Corporation had sought to levy a distress, what could they have levied upon? It seems obvious that the only property of Dale-Howe Corporation they could levy on would be tangible personal property upon the premises. They could not levy upon the choses in action such as the rights to receive rents from the subtenants. As to these, they would probably have the right of attornment and could exercise the same by reciting the terms of their lease and giving notice to the apartment tenants to pay the rent to them. See In re Uni-Lab, Inc., 282 F.2d 123 (3d Cir. 1960), holding there is no lien absent a distraint under Pennsylvania law. See In re Tschopp's Estate, 71 Pa.Super. 434 (1919) (liquor license); Supplee-Biddle Hardware Co. v. House, 40 Lack. 122 (1940); In re Ruppel, 97 F. 778 (W.D.Pa.1899) (leasehold interest); In re Myers, 102 F. 869 (E.D.Pa.1900) (liquor license), cases holding that intangibles are not subject to distress for rent.

For this reason, we hold that Harman is entitled to be paid $2,591.04 the amount of its claim out of this fund. The balance of the fund belongs to First Real Estate Investment Company by virtue of termination of the lease with Dale-Howe Management Corporation and on account of expenses incurred.

An appropriate order will be entered accordingly.

The parties are directed to submit a proper order within 10 days hereafter distributing the fund in accordance with the foregoing opinion and providing for final dismissal of these actions with prejudice.

5. "By the common law, when an execution was levied upon the tenant's goods, the landlord lost his rent, and could not enter to distrain, for the execution took place of all debts, except specific liens, and the goods taken by the sheriff, being in custodia legis, could not be distrained. For remedy of this, and in aid of the landlord, by the statute of 8 Anne 14, it is made imperative upon the sheriff, before he *removes* the goods taken in execution, to pay to the landlord one year's rent. But the Act of the 21st of March 1772, directs that chattels levied in execution shall be subject to the payment of one year's rent for the premises on which they shall be seized, and that the sheriff shall, after the *sale* of the goods, pay to the landlord or other person empowered to receive the same, such rent so due and apply the overplus thereof, if any, towards satisfying the debt and costs."