COMMONWEALTH OF PENNSYLVANIA and Raymond Williams et al.

v.

LOCAL UNION 542, INTERNATIONAL UNION OF OPERATING ENGINEERS et al.

Civ. A. No. 71–2698.

United States District Court, E. D. Pennsylvania.

Dec. 23, 1980.

directly related to the injunctive aspects of this litigation were assessed against certain named party defendants in specified percentage allocations. This Memorandum Opinion sets forth further reasoning and authority for the issuance of that Order.

The action presently before this Court is an employment discrimination suit alleging a pattern and practice of racial discrimination. Suit was instituted in 1971 by twelve black plaintiffs on behalf of a class of minority workers who were either involved in or desired admittance to the trade of operating engineers throughout Eastern Pennsylvania and Delaware. The suit was brought against Local 542 of the International Union of Operating Engineers ("Local"); the Joint Apprenticeship Program ("JATC"); a class represented by Glasgow, Inc. ("Glasgow"), which consisted of over approximately 1400 unnamed contractor-employers who received referrals through the Local 542 exclusive hiring hall system; and, four construction trade associations which had represented contractors in contract negotiations with Local 542.[1]

In March, 1972, the Court granted plaintiffs' motion for certification of both plaintiff- and defendant-classes, pursuant to Fed.R.Civ.P. 23(b)(2). The plaintiff-class consisted of:

(a) all minority group members who currently have the skills, when measured by objective standards, of at least a journeyman operating engineer and who work, or may work, within the territorial jurisdiction of defendant Local 542;

(b) all minority group members who are partially skilled, when measured by objective standards, to perform operating engineers work and who work, or may work, within the territorial jurisdiction;

(c) all unskilled minority group members who wish, or may wish, to acquire

Harold I. Goodman, Philadelphia, Pa., for plaintiffs.

Marvin I. Barish, Philadelphia, Pa., John J. McAleese, Jr., Bala Cynwyd, Pa., for defendants.

## MEMORANDUM OPINION

BECHTLE, District Judge.

On May 29, 1980, this Court entered Post Decree Order # 10, in which various costs

---

**1.** Those trade associations are: Contractors Association of Eastern Pennsylvania ("CAEP"), Pennsylvania Excavating Contractors Association ("PECA"), General Building Contractors Association, Inc. ("GBCA"), and United Contractors Association ("UCA"). The PECA was dissolved in 1972.

skills in the operating engineers trade and who are physically capable of acquiring such skills and performing operating engineers work within the territorial jurisdiction of defendant Local 542.

The defendant-class consisted of:

(a) all contractor associations which are, or may be, parties to a collective bargaining agreement with Local 542, International Union of Operating Engineers; and

(b) all contractor-employers who are subject to collective bargaining agreements with Local 542, International Union of Operating Engineers, and who, pursuant to such agreements, employ or will employ operating engineers referred to them by defendant Local 542.

After considerable legal turbulence,[2] the trial to determine the issue of liability[3] commenced in January, 1976, and ended in June, 1977, during which lengthy testimony along with complex statistical evidence was presented by both sides.

Ultimately, on January 2, 1979, after a period of impoundment, the Court released its liability opinion, 469 F.Supp. 329 (E.D. Pa.1978), in which the Court held that Local 542 and the JATC had engaged in intentional discrimination in violation of Title VII, 42 U.S.C. § 2000e et seq., and 42 U.S.C. §§ 1981, 1985(3) on the theories of discriminatory impact and discriminatory purpose. The Court also held that, under the theory of vicarious responsibility, the class of defendant contractor-employers and the contractor associations were injunctively liable under § 1981 for the discriminatory actions of the Local and the JATC. The Court made no determination as to the issue of damages based on individual liability, if any, of any of the defendants, instead reserving that difficult determination for Stage II of the litigation.

Finally, on November 7, 1979, the Court released from impoundment its final Judgment and Decree granting the plaintiff-class specific injunctive relief, including integration into the operating engineers workforce through the use of hour and wage percentage goals, training, upgrading and other forms of relief.[4] Included were specified legal obligations of the defendants in order to effectuate those injunctive goals over a five-year period. Underlying those various forms of injunctive relief were a variety of costs which were to be borne by "the defendants." See Judgment and Decree at ¶¶ 1, 24, 42, 46.

It is this difficult but necessary allocation of those costs which are directly related to the injunctive aspects of this litigation that formed the subject of Post Decree Order # 10[5] and this Opinion.

Five major questions confront the Court on the issue of taxing and allocating costs

2. See Commonwealth of Pa. v. Local 542, 347 F.Supp. 268 (E.D.Pa.1972), aff'd, No. 72–1901 (3d Cir. May 21, 1973); Commonwealth of Pa. v. Local 542, 388 F.Supp. 155 (E.D.Pa.1974), No. 74–2281 (3d Cir. Dec. 30, 1974) (denying petition for writ of mandamus); Order (3d Cir. Feb. 25, 1975) (denying petition for stay pending application for certiorari), cert. denied, 421 U.S. 999, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975); Commonwealth of Pa. v. Local 542, No. 74–1772 (3d Cir. July 27, 1975) (order denying petition for writ of mandamus and for writ of prohibition), cert. denied, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); Commonwealth of Pa. v. Local 542, No. 76–1290 (3d Cir. March 10, 1976) (order denying writ of mandamus); Commonwealth of Pa. v. Local 542, No. 76–1331 (3d Cir. March 17, 1976) (order denying supplemental petition for writ of mandamus and the supplemental petition for stay); Commonwealth of Pa. v. Local 542, 73 F.R.D. 544 and 551 (E.D.Pa.1976), aff'd, 552 F.2d 498 (3d

Cir.), cert. denied sub nom., Freedman v. Higginbotham, 434 U.S. 822, 98 S.Ct. 67, 54 L.Ed.2d 79 (1977).

3. This case was bifurcated by Judge Higginbotham into a liability stage ("Stage I") and a damage stage ("Stage II"). Stage II of this litigation has not yet commenced.

4. This action was transferred to the present Court by Order dated December 6, 1979, from Judge Higginbotham due to his elevation to the United States Court of Appeals for the Third Circuit.

5. In Post Decree Order # 10, the Court ordered the following percentage allocations of injunctive-related costs against the six named defendants: Local 542—40%; JACT—25%; CAEP—10%; UCA—10%; GBCA—10%; and Glasgow, Inc.—10%.

To date, the following total sums have been paid by the following parties for costs found by

under the Judgment and Decree. They are: (1) what types of costs are directly related to the injunctive aspects of this litigation; (2) what parties should pay those costs; (3) in what percentage share should such costs be borne by each party; (4) when should those costs be paid by those parties; and, (5) should specific costs be assessed against specific individual parties?

## I. Types of Costs

The Judgment and Decree addresses several features of injunctive relief which naturally and necessarily warrant the creation and imposition of various costs. Those costs include: (1) the cost of the preparation and mailing of notices of the Judgment and Decree to plaintiff-class members (¶ 46); (2) the cost of the preparation and mailing of notices of the Judgment and Decree to defendant-class members (¶ 46); (3) costs incurred by the Master, including his fees, expenses and costs;[6] and, (4) any other costs which include, but are not limited to, costs incurred by the

Advisory and Reporting Committee (¶¶ 42, 43), costs incurred in publicizing the Judgment and Decree (¶ 47) and costs incurred in the development of the retraining and upgrading programs, including special training of the Benjamin Franklin graduates (¶¶ 24, 41, 42).

Specific items that are *not* included as costs directly related to the injunctive aspects of this litigation include any assessment of damages which is specially reserved for Stage II of this litigation, plaintiffs' counsel fees, any amounts claimed by counsel on account of counsel's services[7] and any sums required by the Court to be paid as a direct consequence of any civil or criminal contempt arising under any of the Court's Orders heretofore or hereinafter issued.

## II. Taxation and Allocation of Injunctive Costs Generally

A variety of arguments have been forcefully advanced by the various parties in

the Court to be directly related to the injunctive aspects of this action: Local 542—$36,056; JATC—$22,534; CAEP—$9,013; UCA—$9,013; GBCA—$9,013; and, Glasgow, Inc.—$4,506 (Total paid: $90,135). *See* Post Decree Orders 13, 14, 17 and 18.

6. Judge Higginbotham, in his August 8, 1979, Judgment and Decree, ordered various delegations of judicial authority to a federal magistrate pursuant to 28 U.S.C. § 636, and E.D.Pa. Local Rule 46. Those functions and duties would include monitoring, implementation and mediating functions for the various programs and disputes that might arise under the Judgment and Decree. *See* Judgment and Decree ¶¶ 10, 11, 15, 24, 25, 29, 41, 43, 44, 46, 47. This Court, in Post Decree Order # 2 at ¶ 5, determined that those functions and duties should be delegated to a court-appointed special master under Fed.R.Civ.P. 53, as opposed to a federal magistrate. The Court made that determination based on one major and one minor consideration. First, of foremost consideration to the Court was that federal magistrates in this district are at present, as Judge Weinstein similarly held in *Hart v. Community School Board of Brooklyn, New York School District # 21,* 383 F.Supp. 699 (E.D.N.Y.1974), "[t]oo heavily engaged in their regular duties to acquire the expertise and spend the time required to advise the court in the matter at hand." *Id.* at 764. Magistrates in this district are particularly heavily engaged in an increasing number of social security appeals, criminal contempt mat-

ters arising from the Whitman Park litigation and prisoners' rights cases. This concern is especially timely in light of the recently adopted 1979 amendment to the Federal Magistrates Act which provides that jury trials in some criminal cases can now be held before federal magistrates, 18 U.S.C. § 3401. This enlarged duty only further serves to limit the time and resources a magistrate in this district could expend in a complex and lengthy litigation of the type presently before the bar. Second, the Court determined that a referral to a federal magistrate, as opposed to a court-appointed master, would constitute an unfair taxation of costs against the taxpayer. The costs for referral to a master to assist the Court in effectively implementing an injunction should more properly and fairly fall upon those parties whose discriminatory conduct necessitated the injunctive relief imposed, and not the taxpayer. *See Valenstein v. Bayonne Bolt Corporation,* 6 F.R.D. 363, 366 (E.D.N.Y.1946); *General Motors Corporation et al. v. Circulators & Devices Manufacturing Corporation,* 67 F.Supp. 745, 746 (S.D.N.Y.1946).

7. The Court expressly reserves for future disposition the issue of the taxation and allocation of plaintiffs' counsel fees and costs incurred either during the liability determination or the injunctive formulation and implementation stages of this litigation.

their pleadings addressing the issue of the taxation and allocation of the costs related to the Court's Judgment and Decree. Many of these arguments go directly to the taxation and allocation of specific costs (*i. e.*, notice to class members; costs of the Master), while others encompass the overall subject of taxation and allocation of injunctive-related costs. It is these general arguments that the Court will first address before moving on to a discussion of the assessment of specific costs against specific parties.

The major argument advocated by many of the named and unnamed defendants is that, although they have been held injunctively liable, they cannot be assessed costs related to that injunction when the only theory of liability upon which they were held injunctively liable is that of vicarious responsibility for the discriminatory acts of Local 542 and the JATC. Therefore, they argue, the Local and the JATC are the primary responsible or faulting parties and should be assessed the full injunctive costs.

■ The initial question is whether under Fed.R.Civ.P. 54(d) a party only held injunctively liable and not liable for damages may nevertheless be assessed costs related to that injunction. Several courts, including the Third Circuit Court of Appeals, have held in the affirmative. *See Jones v. Diamond*, 594 F.2d 997, 1022–1029 (5th Cir. 1979); *Samuel v. University of Pittsburgh*, 538 F.2d 991, 999 (3d Cir. 1976); *Kyriazi v. Western Electric Company*, 465 F.Supp. 1141, 1144–1148 (D.N.J.1979) (concerning Rule 54(d) and Rule 53(c) master's costs).

■ This Court concurs with the above courts for the simple reason that fairness demands that a party held responsible for the imposition of an injunction should bear a share of the costs needed to successfully *implement* that injunction and ensure the fulfillment of the injunctive mandate. A party which is a non-prevailing party in an injunctive action is as much bound by the provisions of Rule 54(d) as a non-prevailing party in a pure damage action. Payment of costs for injunctive relief naturally involves the payment of money, but the purpose of such payment is to implement that relief and does not constitute damages, in the classic sense, flowing to individual prevailing parties from non-prevailing parties in the form of restitution, back-pay, etc.

■ The second issue before the Court presents a more difficult analysis; however, the Court finds helpful support in the decisions of several federal courts which have been referred to this Court by Local 542. Those decisions support the proposition that defendants held injunctively liable solely under a theory of vicarious responsibility are nevertheless liable for "a share" of the costs under Rule 54(d).

■ Preliminarily, there are several court-created doctrines that must be kept in mind when dealing with the issue of the taxation and allocation of costs under Fed. R.Civ.P. 54(d). Trial courts are vested with the sound discretion to allow and to apportion costs under Rule 54(d). *See Farmer v. Arabian American Oil Co.*, 379 U.S. 227, 232–235, 85 S.Ct. 411, 415–416, 13 L.Ed.2d 248 (1964); *Harman Electric Co. v. First Real Estate Investment Co.*, 55 F.R.D. 195 (W.D.Pa.1972). Recently, the Third Circuit Court of Appeals reaffirmed this historical delegation in *Copperweld Steel Co. v. Demag-Mannesmann-Bohler et al.*, 624 F.2d 7 (3d Cir., 1980). The court held:

> Under Rule 54, the determination of which costs will be awarded to the prevailing party is a matter left to the sound discretion of the district court. *Farmer v. Arabian American Oil Co.*, 379 U.S. 227 [85 S.Ct. 411, 13 L.Ed.2d 248] (1964). Although that discretion is not unbounded, it allows the district court a wide range within which its determination will not be upset by an appellate court. This is properly so since it is the district court's direct experience with the case which provides, in large part, the basis upon which the court decides which costs to allow.

At 9. The power of the Court is derived from the express language of Rule 54(d), which provides that costs are allowed to the prevailing party "unless the court otherwise directs." This delegation under Rule 54 is

based upon historical use whereby courts in equity allowed costs as a matter of discretion and not as a matter of right, the latter approach sounding in law. *See* 10 Wright & Miller, *Federal Practice and Procedure*, § 2668 at 141–142 n.34; 6 Moore's *Federal Practice*, ¶ 54.70[3] at 1305 n.2.

A trial court's determination concerning the taxation and allocation of costs will only be disturbed when an abuse of discretion is found. *Morgan v. Kight*, 294 F.Supp. 40, 41 (E.D.N.C.1968). Based on the critical notions of judicial practicality and fairness, costs must be assessed on a case-by-case basis, depending on the facts and equities of each case. *Hansen v. Bradley*, 114 F.Supp. 382, 384 (D.Md.1953).

Although the types of costs allowable under Rule 54(d) are defined in 28 U.S.C. § 1920, that list is not intended to be all-inclusive and is expandable unless a statute or rule dictates otherwise. *Gotz v. Universal Products Co.*, 3 F.R.D. 153, 155 (D.Del.1943). The test for expansion is whether the costs ordered or approved by the trial court are entirely essential for the proper consideration and determination of the case. *Prashker v. Beech Aircraft Corporation*, 24 F.R.D. 305, 314 (D.Del.1959). As to the issue of the proper allocation of court-ordered or -approved costs against non-prevailing parties, costs have been apportioned among both plaintiffs and defendants, *K–S–H Plastics, Inc. v. Carolite, Inc.*, 408 F.2d 54, 60 (9th Cir. 1969), and solely among the defendants in various proportionate amounts, *Warner v. Florida Bank & Trust Co. at West Palm Beach*, 160 F.2d 766, 772 (5th Cir. 1947).

Ultimately, the burden of challenging whether the taxation or allocation of costs is placed upon the non-prevailing party, which party must show why the costs should not be assessed, *Lichter Foundation, Inc. v. Welch*, 269 F.2d 142, 146 (6th Cir. 1959).

In light of these fundamental doctrines, defendant Local 542 has referred this Court to several decisions which bear upon the issues in the present case. Those decisions have held defendants liable for costs even though they were only injunctively liable under the theory of vicarious responsibility. Those courts have held that defendants primarily liable or responsible for active acts of discrimination should bear the costs *along with* other defendants who were only passively responsible. *See, e. g., Chastang v. Flynn & Emrich Co.*, 541 F.2d 1040, 1044–1045 (4th Cir. 1976) (court held that a defendant trustee of discriminatory trust, although a passive defendant by not actively discriminating, was not "a mere volunteer" and would be held injunctively liable and made to bear its "share of the costs" of the litigation but would not be assessed any damages); *Sagers v. Yellow Freight System, Inc.*, 388 F.Supp. 528, 532–533, 535 (N.D.Ga.1974) (although three union defendants were only passively responsible for discrimination, they were assessed one-half, equally apportioned, of attorney's fees and costs, with employer assessed the other one-half share since the employer was the primary responsible party; court held that this allocation scheme equitably apportioned responsibility for discrimination among the various liable defendants); *U. S. v. Masonry Cont. Ass'n of Memphis, Inc.*, 497 F.2d 871, 878 (6th Cir. 1974) (costs assessed against all defendants including union and contractor-employers who were properly joined, even though court overruled in part lower court's ruling that all employers injunctively liable; backpay only to be paid by union and some employers); *Hairston v. McLean Trucking Company*, 62 F.R.D. 642, 673–676 (M.D.N.C. 1974) (union as passive participant in discrimination only assessed one-third of costs and no damages, while two discriminating employers who were primarily responsible parties to pay two-thirds of costs and backpay; reasons for assessing costs against union was to serve as a penalty for discriminating and to promote purposes of Civil Rights Act of 1964 by encouraging those with the power to stop discrimination to use their positions). *See also Guerra v. Manchester Terminal Corp.*, 5 F.E.P. Cases 714, 715 (S.D.Texas 1973) (costs awarded equally among two defendant unions and employer along with backpay).

██ The Court is careful to note that the above cases are distinguishable from the instant action in two respects. First, in each of the above cases, the courts found that the defendants who were passively discriminatory nevertheless were aware in varying degrees of the discriminatory acts of the primarily responsible defendants. This might have prompted some courts to adopt the position of the *Hairston* court that costs would be assessed to promote the purposes of the civil rights statutes of encouraging those with power to stop discriminatory acts. In the instant case, the finding of liability was that the contractors' associations and the contractor-employers were not aware of the discriminatory entrance and referral practices of the Local's hiring hall, or even that they should have been aware of such discriminatory acts. Rather, Judge Higginbotham held that:

> Yet I find that the plaintiffs have failed to prove on a preponderance of the evidence that the associations or contractors viewed simply as a class were actually aware of the union discrimination affecting the employment of minority persons throughout the operating engineer industry in Local 542's jurisdiction. Such knowledge with actual participation in the hiring hall system would of course itself constitute intentional discrimination. I also find that not *all* contractors and associations may be said as a class to have had reasonable notice of the union's discrimination in view of the great number of contractors and the varying size and intensity of their work. Nevertheless, I find that the contractors and associations are injunctively liable to the plaintiff class under § 1981 as a result of their contractual relationship to and use of a hiring hall system which in practice effectuated intentional discrimination, whether or not the employers and associations knew or should have known.

469 F.Supp. at 401. However, this Court finds that the degree of responsibility or the degree of passivity is not an issue totally precluding those passive defendants from being assessed any injunctive-related costs but, rather, goes to the further question of what percentage of those costs they should bear in light of the finding of liability to date.

██ At present, the finding of collective injunctive liability carries with it a finding of shared responsibility not only for certain aspects of that injunction including reporting requirements and hour-and-wage goal requirements, but to collectively bear the costs that are necessitated by that same injunctive mandate. Basic fairness demands collective assessment. Again, notions of equity do come into play when a determination must be made as to what portion of the costs should be shared among the various parties. It is only that issue that goes to the degree of responsibility under the notions of primary and passive liability under a theory of vicarious responsibility. Fairness would be abrogated if the full share of injunctive-related costs were assessed against the primary responsible party, while at the same time the full share of the injunctive liability is not.

Intertwined with these critical notions is another distinguishing factor this case bears from the cases cited by Local 542 in its memorandum of law—that factor being that the costs assessed in each case concerned costs the plaintiffs had incurred during the course of the litigation and were not costs directly related to the implementation of injunctive relief. The important distinguishing point of this factor is that, while payment of plaintiffs' litigation costs would help to make the plaintiffs whole again and encourage plaintiffs in general to file discrimination actions, see *New York Gaslight Club, Inc., et al. v. Carey*, 447 U.S. 54, 60–62, 100 S.Ct. 2024, 2029–2030, 64 L.Ed. 2d 723 (1980), payment of injunctive costs serves another purpose—as previously stated, that being to effectuate the injunction by defraying costs that are necessarily built into that injunction and which must be paid in order to successfully further the injunctive relief ordered. In the present case, for example, the costs of notices to class members is essential in order to have notices sent to both plaintiff- and defendant-class members to, in all fairness, bind

them to the injunctive relief ordered. Without notice, they cannot be expected to be bound by the injunctive requirements placed upon them as members of the defendant-class or to pay those costs associated with the injunction. *See In re Nissan Motor Corp. Antitrust Litigation,* 552 F.2d 1088, 1102–1106 (5th Cir. 1977). This type of cost does not further the purposes set forth in *New York Gaslight, supra,* but, rather, goes to the heart of the action—the injunctive relief requested.

In support of their position that defendants held injunctively liable under a theory of vicarious responsibility cannot be assessed costs, named party defendants Glasgow, Inc., and the three defendant contractors' associations refer the Court to the case of *Rios v. Enterprise Ass'n Steam-Fitters Local 638 of U. A.,* 400 F.Supp. 988 (S.D.N. Y.1975). There, the court held that the primary force behind the discrimination against minority workers was Local 638, but held the Local, the Mechanical Contractors Association ("MCA") and the Steamfitters' Joint Apprenticeship Committee ("SJAC") injunctively liable. As to the liability of MCA, the *Rios* court held:

> *MCA.*—Plaintiffs seek to have MCA share in the burden of providing back pay. MCA, a trade association of certain contractors in the New York area, acts only in collective bargaining negotiations between its members and Local 638. MCA does not employ steamfitters; rather, employment is done by its members. While MCA was found to have been properly made a party defendant in the *Rios* action (360 F.Supp. [979] at 994–95), that finding did not imply that MCA was "responsible *ipso facto* for all the employment practices here found unlawfully discriminatory or ... liable in damages to the plaintiffs in Rios. Plaintiffs have shown no specific instances of MCA discrimination. Rather, plaintiffs have demonstrated only that there has been a lack of nonwhite employment in the industry generally and that, in conse-

quence, the industry's referral practices must be changed." *Id.* at 995–96.

400 F.Supp. at 992. The Court also held:

> The JAC is a non-profit joint labor-management committee which, now as well as during the time preceding issuance of the permanent injunction in this action on June 21, 1973, conducted the steamfitters' apprenticeship program. However, JAC was not found to have purposefully discriminated against members of the plaintiff class. JAC adopted the aptitude tests used to screen applicants to the apprenticeship program in good faith upon the recommendation of experts.

400 F.Supp. at 997.

Finally, as to the issue of costs, the court found that Local 638 alone should be assessed the plaintiffs' full costs and that no costs should be assessed against either the MCA or the SJAC. 400 F.Supp. at 998.

The applicability of the *Rios* decision to the instant action must be seriously questioned. First, the *Rios* court offered no authority or rationale as to why the Local alone should bear the plaintiffs' full costs, where all the defendants were found injunctively liable. Furthermore, the *Rios* court not only assessed all the costs against Local 638 but awarded backpay to the plaintiffs to be paid solely by the Local. In the instant action, no damages of any kind have been assessed against any defendant. That issue has been expressly reserved for Stage II of the litigation. Therefore, whether the *Rios* court, faced with the instant factual and legal scenario, would have assessed costs in a similar manner is questionable and only serves to undermine any precedential weight the decision might have otherwise held. Finally, as Judge Higginbotham noted in his liability decision in this case, on appeal of the *Rios* decision, the Court of Appeals for the Second Circuit *in dictum* appeared to equivocate when discussing the potential liability of MCA. In that regard, the circuit court held:

> The *Rios* plaintiffs argue, not without reason, that this relief could not have been ordered absent a finding of discrimi-

nation by MCA, purposeful or otherwise, and that all that is required to establish MCA's liability for backpay is the finding of discrimination; indeed, mere acquiescence in the discriminatory acts of the union would render it liable. *Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d [1364] at 1381–82; *Macklin v. Spector Freight Systems, Inc.,* 156 U.S.App.D.C. 69, 478 F.2d 979, 989 (1973). *See also Robinson v. Lorillard Corp.,* 444 F.2d 791, 799 (4th Cir.), *petition for cert. dismissed,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). Absent any specific finding of discrimination, however, we conclude the district court's finding of nonliability on the part of MCA is not an abuse of discretion. *Guerra v. Manchester Terminal Corp., supra,* 498 F.2d [641] at 655–56. As the district court held, making MCA a party defendant did not imply that MCA was "responsible *ipso facto* for all the employment practices ... found unlawfully discriminatory or ... liable in damages to the plaintiffs in *Rios.* Plaintiffs have shown so [*sic*] specific instances of MCA discrimination." 360 F.Supp. at 995. And the union certainly had primary responsibility for the discrimination. We note that the decision below was without prejudice to any claim a member of the plaintiff's class may have against an employer, but MCA was not itself an employer, and no employers are parties to this action. *See* 400 F.Supp. at 992 n.4.

*Equal Emp. Op. Com'n v. Enterprise Ass'n Steamfitters,* 542 F.2d 579, 589 (2d Cir. 1976).

In regard to that language, Judge Higginbotham stated:

It may be inferred from the above dictum that acquiescence (presumably involving some meaningful level of knowledge or notice) constitutes sufficient involvement by a contractor's association to require holding it liable for back pay relief under Title VII. But it may be inferred from the holding that either back pay liability or injunctive liability without back pay may be imposed in the absence of "acquiescence" and without specific discriminatory acts in the discretion of the trial court. Certainly neither the district court opinion nor the Court of Appeals' opinion in *Enterprise Association Steamfitters* supports the conclusion that an association or employer bearing a legal contractual relation to a union is insulated from liability for the union's discriminatory acts in the absence of participation in or knowledge of such acts. Indeed, the Court of Appeals' affirmance of injunctive liability in the absence of "any specific finding of discrimination" supports an opposite conclusion.

469 F.Supp. at 405–406.

Finally, the *Rios* decision concerned the assessment of plaintiffs' costs incurred throughout the litigation, of which "97% of these costs [were] attributable to court reporters' fees and the costs incident to taking depositions." 400 F.Supp. at 997. As discussed previously, plaintiffs' litigation-related costs are distinguishable from injunctive-related costs, because their imposition serves different purposes and brings into consideration notions of fairness that may not be as compelling when assessing litigation costs. For present purposes, the Court finds that the imposition of injunctive-related costs against both the primary and passive responsible defendants in this action is necessary and fair and is an issue that was not raised in the *Rios* case. Therefore, this Court believes it is not bound by nor persuaded to follow that decision.

III. *Taxation and Allocation of Injunctive Costs Proportionately Against the Defendants and the Time Schedule for Cost Taxation*

In resolving that all defendants shall pay the injunctive costs, two additional questions follow—those being, which defendant parties should pay what share of those costs and at what point in time?

▆ In regard to the percentage allocation of costs set forth in Post Decree Order # 10, that assessment was made upon what the Court believed to be the delineated de-

gree of responsibility of the defendants for the discriminatory acts, as set forth by Judge Higginbotham in his findings of fact and conclusions of law. The allocation was not made with mathematical precision and cannot be. Rather, it was based upon what the Court perceived to be the participation in and knowledge of the various parties of the discriminatory acts found. Local 542 and the JATC, as the primary responsible parties, were assessed the greatest share of the costs. The contractors' associations, whose involvement in and apparent knowledge of the discriminatory acts found was not as great, were assessed a lesser percentage but more than Glasgow and the defendant-class of contractor-employers who were found to not have had any knowledge of the discriminatory actions by the Local and the JATC, nor actually negotiated collective bargaining agreements with the Local nor been signatories to the previous "Affirmative Action Program" which was found by Judge Higginbotham to be founded upon distorted statistics, see 469 F.Supp. at 342–345, 384, and only constitutes one contractor-employer as opposed to the associations which contain substantially more members.

■ Regarding the issue of the equal percentage allocation among the three contractors' associations, the Court understands that those associations differ in size by total membership. However, the Court cannot attempt to base the allocation strictly on total membership figures because, first, all three associations were found equally liable under the same statute and theory of liability. Second, membership figures alone do not indicate the total number of operating engineers each association member has employed since 1965 or the number of hours they have worked; nor does it indicate the financial resources of each member or the amount of dues paid into the association by members, if those two factors were found to be relevant. These types of calculations, if they could ever be reliably made, would require detailed and lengthy discovery and hearings, both of which the Court at this time cannot afford to commence because the delay that would be occasioned by these procedures

would serve to further prejudice both plaintiff and defendant parties. Even if the calculations could be made, they would probably concern the types of matters that are best designed for disposition by the Master, which would incur additional costs to the parties. Finally, any inequities that might have been or will be occasioned by the Court's present equal allocation scheme by association will be cured during the contribution phase of the litigation, which is discussed in detail below. For present purposes, the Court finds the costs percentage allocation method covered to be substantially fair in light of the liability findings of Judge Higginbotham regarding the responsibility and knowledge each party had of the discriminatory acts committed.

■ Several practical considerations dictate the resolution of the second question concerning the time frame in which to tax costs. The class of defendant contractor-employers is composed of approximately 1400–1500 members, scattered throughout Eastern Pennsylvania and Delaware. The initial injunctive costs that are required to promptly effectively implement the injunction include costs of notices to plaintiff- and defendant-class members, a publicity program to advise plaintiff-class members of their rights under the Judgment and Decree, the initial costs of the Master and preliminary costs relating to training and upgrading programs. These costs are presently needed to implement the initial stages of injunctive relief that, if delayed, would serve to further frustrate the rights of plaintiffs and possibly extend the length of the Decree, which would prejudice defendants. This delay would realistically result if the Court were required to collect sums from approximately 1400 contractor-employers. Furthermore, the 1400 unnamed defendant-class members have only recently received notice of the Judgment and Decree. Such notice packages were mailed August 29, 1980, due to excusable delay caused by pending motions to amend the Decree which had been filed by the parties and which had to be first resolved by the Court before notices could be sent. As pre-

viously discussed, it would be fundamentally unfair to assess costs of notices or any costs against defendants who had not yet received notice of their responsibilities and duties under the Judgment and Decree that resulted in those same costs. It was for these two important reasons that the costs of the injunction were assessed against those defendants who were both readily and easily determinable and accessible to the Court and had also received notice of the Judgment and Decree by their very participation in this lawsuit through the liability and the initial injunctive stages of this case. Therefore, the Court found that, in the interests of due process and judicial efficiency and economy, the costs should be assessed solely at this time against named party defendants.

### (A) *Contribution*

The Court in Post Decree Order # 10 spoke of a right of contribution being available to named party defendants against unnamed party defendants for the initial costs assessed. A further explanation of that right, the Court believes, would be beneficial at this time.

In the recent case of *Glus et al. v. The G. C. Murphy Company et al.*, 629 F.2d 248 (3d Cir., 1980), the Third Circuit Court of Appeals held that:

> Initially most American courts held that there was no right of contribution under the common law, relying on the English decision *Merryweather v. Nixan*, 8 Term R. 186, 101 Eng.Rep. 1337 (K.B.1799). *See, e. g., Union Stock Yards Co. v. Chicago, Burlington, & Quincy Railroad Co.*, 196 U.S. 217 [25 S.Ct. 226, 49 L.Ed. 453] (1905). This prohibition resulted from the belief that a wrongdoer should not be able to shift the responsibility of his actions to the shoulders of another. The rule prohibiting contribution has come into disrepute. It is now widely recognized that fundamental fairness demands a sharing of the liability. Without a right of contribution a wrongdoer may escape liability for his actions because of the happenstance of the plaintiff's choice

of defendants. *See* Prosser, *The Law of Torts*, § 50 (4th ed. 1971). *See also* Sellers, *Contribution in Antitrust Damage Actions*, 24 Vill.L.Rev. 829, 855–63 (1979) (reviewing state law on contribution). The vast majority of the states have now rejected the prohibition either by statute, *e. g.*, Del.Code tit. 10, §§ 6301–08; Pa. Cons.Stat.Ann. tit. 42 §§ 8323–27 (Purdon 1979), or by judicial action. *E. g., Knell v. Feltman*, 174 F.2d 662 (D.C.Cir.1949); *State Farm Auto Insurance Co. v. Continental Casualty Co.*, 264 Wis. 493, 59 N.W.2d 425 (1953).

At 252.

■ Although the *Glus* decision was a Title VII action, this Court finds that, in this joint Title VII and § 1981 litigation, general notions of fundamental fairness dictate that parties collectively injunctively liable are collectively liable for costs related to that same injunction. In that vein, the finding and rationale of the *Glus* court is equally applicable that the unnamed contractor-employer defendants "can't escape liability for [their] actions because of the happenstance of the plaintiff's choice of defendants." *Id.* This is especially true of costs for injunctive relief which directly relate to actions and responsibilities of all the defendant contractor-employers in satisfying their injunctive responsibilities.

■ The right of contribution of costs shall only accrue to the three defendant contractors' associations and Glasgow which, along with the other unnamed defendant contractor-employers, were held injunctively liable solely under § 1981 upon the theory of vicarious responsibility for the active discriminatory acts of the Local and the JATC.

The right of contribution will not accrue to Local 542 or the JATC because they were found to be primarily responsible for the discriminatory actions. They will not, therefore, be permitted to further spread the burden of their wrongdoing on those parties who were only passively discriminatory beyond the share of costs that have already been assessed by this Court against the other defendants. The right of contri-

bution is based upon the principle that parties equally responsible for wrongdoing shall equally pay for that wrongdoing. Prosser, *The Law of Torts*, § 50 (4th ed. 1971). Where, as here, the parties are not equally responsible, then the responsibility shall be shared in an equitable fashion, which this Court believes has been done.

The measure of contribution from unnamed defendant contractor-employers should be based upon the percentage share of hours each of those defendants has or will report to the Local 542 pension and welfare fund for the period January 1, 1980, to December 31, 1980. This is the period during which the majority of the injunctive costs will be paid. The Court understands from the representations of the plaintiffs that the percentage share of hours reported to the fund is based upon the number of hours worked by operating engineers from the Local for each particular contractor-employer. During this model period, for example, if Contractor "X" reported to the pension fund of the Local .5% of the total hours of all those hours reported to the pension fund by all the reporting contractor-employers in the five districts of Local 542, then the potential liability of that contractor for contribution would be .5% of 35% of the total costs paid as of the date the contribution action is commenced. The 35% represents the percentage of the total injunctive costs that the three contractors' associations and Glasgow have been assessed. Therefore, the three contractors' associations and Glasgow could each separately, or collectively, seek contribution from any or all of the unnamed defendant contractor-employers who are members of the defendant-class. This right will accrue at any time in the future. If Glasgow sought a right of contribution from the same Contractor "X", it would be entitled to recover .5% of 5% of the total costs paid as of the date the contribution action was commenced. While individual contribution actions are permissible, the Court believes that one collective contribution action by all three of the contractors' associations and Glasgow, against all the unnamed defendant contractor-employers who are members

of the defendant-class, would be more efficient and less burdensome for all parties concerned.

Through this availability of a viable right of contribution which the Court believes is a fair and sound equitable remedy, a proper balance can be maintained between competing concerns. On the one hand, those defendant parties who by happenstance were named defendants in this action and found liable solely under a theory of vicarious responsibility can share the costs they have been required to pay for the implementation of the injunction with the other wrongdoers who were also found vicariously liable; and, on the other hand, the Court is not presently hampered in effectively and promptly collecting those initial injunctive costs which are needed to prevent undue delay and prejudice to all parties under the Judgment and Decree. The Court finds that the method and manner of cost allocation, that has been heretofore ordered, fairly and justly serves both of these competing interests.

IV. *Assessment of Specific Costs Against Specific Parties*

Aside from the general arguments as to whether injunctive costs as a whole should be assessed against certain defendants based upon the degree of responsibility they bear for the acts of discrimination, additional specific arguments have been raised by the defendants that relate to the further question of whether certain injunctive costs should be borne by certain defendants. These arguments are not delineated based on notions of responsibility or liability as the above general arguments were based, but instead are directed toward two issues: (1) whether unnamed as opposed to named party defendants should bear any of the injunctive-related costs; and, (2) whether certain defendants, either named or unnamed, should bear specific costs as opposed to each bearing a percentage share of the total injunctive costs.

(A) *Assessment of Costs Against Unnamed Defendant-Class Members*

Unnamed defendants Bechtel Power Corporation ("Bechtel") and United Engineers

& Constructors, Inc. ("United Engineers"), represented by separate counsel, have filed with the Court legal memoranda addressing the imposition and allocation of costs against unnamed defendant-class members. Their arguments center around the language of Fed.R.Civ.P. 54(d) (concerning the imposition of costs, including class notices, the publicity program, etc.) and Fed.R. Civ.P. 53 (which specifically deals with the costs of a court-appointed master).

Rule 54(d) provides that costs should be awarded to the "prevailing party." Bechtel and United Engineers argue that this rule conversely implies that costs are to be assessed against the "nonprevailing party." They argue that they, as unnamed defendant-class members, are not parties to this litigation because they were neither named in nor served with the complaint in this case. Similarly, Rule 53(a) states that the costs of the Master "shall be charged upon such of the parties ... as the court may direct."

They cite in support of their argument several district court decisions concerning either the imposition of discovery devices, see *Lamb v. United Security Life Company*, 59 F.R.D. 44, 48–49 (S.D.Iowa 1973); *Wainwright v. Kraftco Corporation*, 54 F.R.D. 532, 534–535 (N.D.Ga.1972); *Fischer v. Wolfinbarger*, 55 F.R.D. 129, 132–133 (W.D.Ky. 1971), or the assertion of counterclaims against unnamed or absent class members, see *In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322, 349 (E.D.Pa.1976); *Donson Stores, Inc. v. American Bakeries Company*, 58 F.R.D. 485, 488–489 (S.D.N.Y. 1973).

A careful review of these cases, and the rationale asserted in each, persuades the Court that they are not applicable in the present action concerning the imposition of injunctive costs against unnamed defendant-class members for several reasons.

Basically, four major arguments have been repeatedly advanced by the above

courts concerning the use of discovery devices or counterclaims against absent class members. First, a few courts argue that, because Fed.R.Civ.P. 23 does not designate absent class members as "parties," then they are not parties. This argument is specious at best because neither does the rule state that absent class members are *not* parties. Second, several courts have contended that the purpose of the class action rule is to avoid a massive joinder of parties who are too numerous in the first instance to undertake individual actions. Therefore, those courts hold that declaring absent class members as parties and imposing discovery and counterclaims procedures upon them would flood the courts with an influx of parties and their attorneys, which would only serve to frustrate the purpose and design of Rule 23 class actions under which a class representative is to represent the interests of the class. The Court believes that those concerns might be legitimate during the pretrial or trial stages of a class action. However, those same concerns dissipate when speaking of the post-trial injunctive stage of the case. At that stage, absent class members have already been found injunctively liable. In effect, the imposition of liability against the defendant-class has the effect of creating a massive joinder by creating a panoply of duties and responsibilities to be shared equally by all members of the class and not merely the class representative. Once the injunction is implemented, absent class members do not and cannot remain passively behind the shield of the class representative as they may have done previously throughout the litigation. At that stage, they must take an active role in furthering the injunctive relief ordered by the Court, which entails as one of its responsibilities the imposition of costs. To hold to the contrary would completely abrogate the purpose and design of Rule 23(b)(2) defendant-class actions.

Third, many courts have relied upon Rule 23(d)(2),[8] which allows courts to direct that

---

**8.** Fed.R.Civ.P. 23(d)(2) provides, in pertinent part:

(d) *Orders in Conduct of Actions.* In the conduct of actions to which this rule applies, the court may make appropriate orders:

absent class members be given notice that they have the option of appearing through their own counsel instead of being represented by the class representative. Respectively, this Court can find no language in the rule, as the above courts have, stating or even implying that once an absent class member pursues his or her Rule 23(d)(2) option and appears in court through independent counsel that they only then become "parties" to the action. What procedural status they may have had before that appearance is unclear—"non-parties"?

■ In the instant action, Judge Higginbotham early in the litigation did direct that notices be sent to unnamed defendant-class members informing them of the pendency of this litigation and that they may be members of the defendant-class. Ironically, both Bechtel and United Engineers did so appear through their own counsel and have continued to be so represented throughout the pendency of this suit and have filed their own separate responses to the imposition of costs against defendant-class members. However, the Court is not persuaded, for purposes of this stage of the litigation, by the Rule 23(d)(2) argument that only when the 23(d)(2) option is exercised does an absent class member become a party. The Court is not so persuaded because, as mentioned before, where a passive role might be appropriate for absent class members *prior* to a finding of injunctive liability, once the injunction is entered, those passive members become involuntary active members, with all the duties and responsibilities imposed on named parties, including the class representative. *See* Note, 91 Harv.L.Rev. 630, 647–650 (1978). Furthermore, in *Donson, supra,* upon which defendants rely, the court specifically stated that, "if liability was established, other issues, including damages and counterclaims can be handled on a class member-by-class member basis." 58 F.R.D. at 489–490.

\* \* \* \* \* \*

(2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the

This is exactly what has resulted in the instant imposition of costs.

■ Finally, the last argument advanced is that the imposition of discovery or counterclaim devices against individual absent class members would destroy the class-wide texture of class actions. For present purposes, to impose costs only against the class representative and not the other equally liable members of the class would also destroy the class-wide imposition of collective injunctive relief.

In conclusion, it should also be noted that the cases cited by the unnamed defendants have not received the full support of other courts. In *Brennan v. Midwestern United Life Ins. Co.,* 450 F.2d 999 (7th Cir. 1971), the Court of Appeals for the Second Circuit held that absent class members could be served with interrogatories because:

> [i]t is true that an absent class member is given a "free ride" under Rule 23 and has no duty to actively engage in the prosecution of the action. Yet the absent class member's interests are identical with those of the named plaintiff and his rights and liabilities are adjudicated in the principal suit. If discovery from the absent member is necessary or helpful to the proper presentation and correct adjudication of the principal suit, we see no reason why it should not be allowed so long as adequate precautionary measures are taken to insure that the absent member is not misled or confused. While absent class members should not be required to submit to discovery as a matter of course, if the trial judge determines that justice to all parties requires that absent parties furnish certain information, we believe that he has the power to authorize the use of the Rules 33 and 34 discovery procedures.

*Id.* at 1005. *See also American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 551,

action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action . . . .

94 S.Ct. 756, 765, 38 L.Ed.2d 713 (1974) ("claimed members of the [23(b)(3)] class stood as *parties* to the suit until and unless they received notice thereof and chose not to continue") (emphasis supplied); *McCubbrey v. Boise Cascade Home & Land Corp.*, 71 F.R.D. 62, 72 (N.D.Cal.1976) ("[a]bsent class members are parties to an action, properly before the court, and are subject to its judicial orders").

(B) *Assessment of a Percentage Share Rather Than a Specific Share of the Costs*

In answering this contention, several basic notions must be reexamined and a few new factors raised. The Court believes that an argument could be made that some costs of the injunction could be traceable to particular defendants. For example, the cost of notice to unnamed contractor-employer "X" has already been paid in some proportionate amount by all of the named party defendants, although the cost is directly applicable to that contractor. However, just focusing on the costs of notices, as emphasized before, one of the utmost concerns of the Court in imposing the initial injunctive-related costs was to accomplish that task with undue delay but in a substantially fair manner. That entailed assessing all the initial costs in the first instance against named party defendants. Second, as also mentioned before, the cost of notice or any other cost could not in the interests of fundamental fairness be assessed against the party receiving notice until that notice was received and read. Third, the right of contribution will cure this necessary imposition of costs if any inequities can be said to have resulted, because the percentage share of contribution sought from each contractor-employer will subsume this initial cost of notice and many other costs as part-and-parcel of the contribution share recovered by the named party defendants.

Fourth, aside from the due process concerns of the costs of notices to class members, the clearly foreseeable problems that would flow from a method of taxation of specific costs against individual defendants are manifold. For example, how can it be determined whether the costs associated with the publicity program envisioned under ¶ 47 of the Judgment and Decree are directly attributable or traceable to any particular defendant? Should the approach be which defendant will ultimately receive the "benefit" of that program? Will the Local or the JATC bear the "benefit" of the publicity program because arguably the program will result in additional plaintiff-class members entering the Local or the JATC, thereby helping in enabling them to better reach their percentage goal requirements for new entrants? Or, will the ultimate benefit of the program be to those individual contractor-employers who will ultimately be referred those minority operating engineers who were recruited through the publicity program and, in turn, their influx will enable those contractor-employers to better meet their hour-and-wage goals under the Decree? Another example would be costs associated with the upgrading and training program under the Decree. Is this program really benefitting the Local because they will be receiving newly trained minority entrants or is it benefitting the contractor-employers who will eventually benefit from the newly acquired or reinforced skills possessed by minority operating engineers referred to them?

On the other hand, should the approach to use in taxing costs be one of determining which defendant(s)'s prior discriminatory actions *necessitated* the imposition of a particular injunctive-related cost? For example, are the costs of the training and upgrading program attributable in some way to the discriminatory acts of the Local as found by Judge Higginbotham in his findings of fact and conclusions of law? The answer is clearly "no" because Judge Higginbotham found *all* defendants injunctively liable and, therefore, collectively responsible for *all* the discriminatory acts of the past, although under different statutory bases and theories. Once again, the degree of responsibility should not affect whether *any* costs should be paid but only the proportionate *share* of costs that should be paid.

Therefore, the obvious conclusion that must be reached after going through this speculative analysis is that neither approach founded upon either a benefit or responsibility theory to determine the taxation of specific initial injunctive-related costs is practical or desirable. The quagmire of endless conjecture and, hence, litigation into which the Court would be thrust is manifest. As a result, the Court is convinced that the approach taken in Post Decree Order # 10 using an across-the-board percentage share allocation, with the right of contribution, is the soundest method from practical, due process and judicial economy points of view.

However, the Court is quick to point out that there may be one notable exception to the above conclusion—that being those costs associated with the court-appointed special master in this case. While the United States Supreme Court in the case of *Newtown v. Consolidated Gas Co.*, 259 U.S. 101, 42 S.Ct. 438, 66 L.Ed. 844 (1922), held that the rate of compensation and the allocation of the costs for the payment of special masters is a matter within the sound discretion of the trial court and is subject to review only in cases of the abuse of that discretion, or where the allocation was erroneous as a matter of law, 259 U.S. at 105, 42 S.Ct. at 439, various formulas have been adopted by the courts in making this allocation. One line of authority, with which this Court fully concurs, holds that the cost of a master should be borne by the party or parties whose conduct *necessitated* the reference to the master. *See Valenstein v. Bayonne Bolt Corporation*, 6 F.R.D. 363, 366 (E.D.N.Y.1946); *General Motors Corporation v. Circulators & Devices Manufacturing Corporation*, 67 F.Supp. 745, 746 (S.D.N.Y.1946). The costs of the Master in this case to date have substantially involved matters that have not been necessitated by the conduct of any particular party. Rather, the costs have pertained to services of the Master that were generally necessitated by the duties imposed under the Decree relating to and affecting all parties. *See* Post Decree Order # 15, at Appendix A–1, and the Court's Order of September 10, 1980 (detailing the services provided by the Master). Specifically, these services have included the development and implementation of the publicity program, assistance in and review of the procedures used in mailing notices to class members and attending meetings of the Advisory Committee concerning the development and implementation of upgrading and training programs.[9] However, there are certain future costs flowing from the duties and responsibilities of the Master which the Court believes will be particularly necessitated by the conduct of an individual party. For example, a grievance or dispute hearing initiated by a plaintiff minority class member against a particular employer would be the type of specific cost that could be said to be directly attributable to a particular defendant. Conversely, if a grievance proceeding initiated by a plaintiff class member would be found by the Master or the Court to have been either frivolous in nature or brought in bad faith, the costs of the Master in that proceeding should be shifted to that individual plaintiff and not the defendant employer. These are matters that the Court believes might require a future reassessment of the manner by which particular injunctive costs should be allocated among the defendants. However, the Court will only consider their application on a case-by-case basis and only where the costs can be clearly and convincingly shown to be attributable to or necessitated by the actions of a particular party and not merely be an exercise in endless speculation and waste of judicial resources.

**9.** To the extent that any of the costs of the Master paid by the named defendants to date can be said to have been necessitated by the conduct of a particular defendant or defendants, the Court will grant leave to the three contractors' associations and Glasgow to affirmatively prove by a clear preponderance of the evidence that a particular defendant or defendants should be assessed a sum representing the costs of the Master that are directly related to a particular matter involving that defendant or defendants.